### INSURANCE COMPANY v. KIGER.

1. Where a factor has against his consignor no interest in the consigned property, he cannot pledge it for his own debt. Such a pledge, although accompanied by a warehouse receipt setting forth that the property is deliverable to the pledgee, is, under the laws of Louisiana, invalid, and confers upon him no title adverse to that of the consignor.

2. In such a case, the obligation imposed by those laws upon the warehouseman is discharged by his surrender of the property pursuant to judicial process sued out by such consignor, notice of which he gave to the pledgee.

3. A warehouseman is not a guarantor of the title of property placed in his custody, although his receipts therefor are by statute negotiable.

ERROR to the Circuit Court of the United States for the District of Louisiana.

On the 11th of March, 1876, the General Assembly of Louisiana passed an act, No. 72, entitled "An Act governing the manner in which cotton-press receipts, warehouse receipts, or the receipts of other custodians of any property whatever, shall be issued, in all cases where such receipts shall or may be used or pledged as collateral security for money advanced or borrowed on faith of the property therein specified, and governing the delivery and disposal of the property for which such receipts may be issued." The sections important to this case are as follows: —

"SECT. 1. Be it enacted, &c., that no cotton-press, or other custodian or custodians of produce or property, shall issue any receipt, or other voucher, for any produce, merchandise, or other property, to any person or persons purporting to be the holder, owner, or owners thereof, unless such produce, merchandise, or other property shall have been actually received into store, or upon the premises of such cotton-press, or other custodian or custodians, shall be in the store, cotton-press, or warehouse, or on the premises aforesaid, or under his or their control at the time of issuing such receipt.

"SECT. 2. That any person, firm, or association who shall or may be, or in any way become the custodians of any property, goods, products, or merchandise whatever, and who may issue receipts therefor, shall not, under any circumstances, or upon any order or guarantee whatever, deliver property for which such receipts have

been issued, until the party or parties to whom the receipts were issued, or the legal holders thereof, shall have surrendered the same to said custodians for cancellation, and in default of a strict compliance with the provisions of this section of this act, they may be held liable by the legal holder or owner of their receipt, for the market value of the property therein described, as may be established by the chamber of commerce of the city of New Orleans, or any committee thereof, approved and authenticated by the president or vice-president of said chamber of commerce.    All warehouse receipts, intended for pledge, under the provisions of this act, shall be paraphed, before being issued, as follows : 'for hypothecation in accordance with the provisions of this act.'"

"SECT. 4. That parties who may borrow money on the faith of warehouse receipts, representing property in store, shall file their affidavit with the pledgees that such property is theirs, the pledgers', personal property, or that it is the property of some party for whom the pledger is acting as agent, factor, commission merchant, or in any other fiduciary capacity, and that said party is justly and truly indebted to the pledger in an amount equal in value to the value of the property pledged, as specified in the warehouse receipts, for moneys paid to him, or paid by his order, and for his account, by the party or consignee making the pledge.    The cashier of a bank, or the secretary of any insurance company, incorporated or working under any law in the United States, or of this State, is hereby authorized to administer the oath contemplated under the provisions of this act.    Any deviation therefrom shall render the party or parties so deviating liable for the value of the property, or any excess in value, over and above the amount for which it may have been pledged, in any manner specified in section one of this act, and *to* prosecution for perjury, and also to obtaining money under false pretences.

"SECT. 5. That the vendor's lien of five days' privilege, now allowed in commercial transactions, for the payment of the purchase price, shall not be affected by the provisions of this act, except in case in which a warehouse receipt has been pledged as collateral for money borrowed.    The holder of the warehouse receipt shall be considered and held as the actual owner of the property described in the receipt, and no clause in this act shall operate to the detriment or injury of the holder of a warehouse receipt, to the extent of the value of the property specified, made, and issued in accordance with, and under the provisions of this act : *Provided,* that where the factor, agent, or pledger may have wrongfully pledged, in

violation of this act, any property, the lien of the owner shall be valid, even against the third holder of the warehouse receipt."

"SECT. 8. That all warehouse receipts, as by this act provided, shall be negotiable by indorsement in blank, or by special indorsement, in the same manner and to the same extent as bills of exchange and promissory notes now are."

On the 19th of March, 1877, Basil G. Kiger, a planter in Mississippi, consigned to Aiken & Watt, his factors in New Orleans, one hundred and ninety-six bales of cotton, with instructions not to sell, but to hold for further directions and better prices. The cotton reached New Orleans March 21, and was stored by Aiken & Watt in the cotton-press of Sam. Boyd & Co. Aiken & Watt had no pecuniary interest whatever in the cotton, and Kiger, the consignor, was not indebted to them. On the contrary, they were largely indebted to him. On the 26th of March, Aiken & Watt borrowed of the Mechanics' and Traders' Insurance Company $4,500, for which they gave their notes to the company, payable in forty days, at eight per cent interest, secured by a cotton-press receipt of Boyd & Co., of which the following is a copy : —

"NEW ORLEANS, March 26, 1877.

"Received from Aiken & Watt the following-described property, to wit: one hundred bales cotton, marked $< K >$, ex. Pargoud, March 21, 1877. Shipper's press. (Printed indorsement in the body of the receipt :) 'The within cotton will not be delivered except on the return of this receipt to the press, properly indorsed.' Deliverable to the Mechanics' and Traders' Insurance Co. or order.
                              "SAM. BOYD & CO."

Indorsement on the back of the receipt printed : —

"Deliver to        or order the within-described property. The above order is accepted, and the property is transferred to —
                              "SAM. BOYD & CO."

Afterwards, on the 3d of April, Aiken & Watt borrowed $2,500 more from the company, and gave a similar press receipt for ninety-six bales as security. The cotton embraced in these receipts was that which belonged to Kiger.

Before the maturity of these notes Aiken & Watt failed.

The notes were protested for non-payment when due, and the makers were adjudicated bankrupts June 16, 1877.

On the 18th of April, 1877, Kiger brought this suit against Boyd & Co., to recover the possession of his cotton. It was delivered to him under the writ which was issued, he giving bond according to law to return it in case of judgment against him to that effect. Afterwards the insurance company was called into the suit by Boyd & Co., and made a defendant by Kiger. The insurance company answered, setting up its claim to the property. Upon the trial, the foregoing facts appearing, the jury were instructed to return a verdict in his favor against the company.

To reverse the judgment rendered on that verdict, the case is now here by writ of error.

*Mr. Thomas Hunton* for the plaintiff in error.

*Mr. Joseph P. Hornor*, *Mr. W. S. Benedict*, and *Mr. Thomas J. Semmes*, contra.

MR. CHIEF JUSTICE WAITE, after stating the facts, delivered the opinion of the court.

There are two questions in this case: 1, whether the insurance company can hold the cotton as against Kiger; and, 2, whether, if it cannot, Boyd & Co. are liable for the amount for which their receipts were pledged.

1. As to Kiger. Before the act of 1876 it was settled by numerous decisions in Louisiana that a factor could not pledge for his own debts the property of his principal. *Stetson* v. *Gurney*, 17 La. 166; *Hadwin* v. *Fisk*, 1 La. Ann. 43–74; *Miller* v. *Schneider & Zuberbier*, 19 id. 300; *Young* v. *Scott & Cage and Cavaroc*, 25 id. 313. The act of 1876 does not, as it seems to us, materially enlarge this power, so far as the facts of this case are concerned. It makes warehouse receipts the representatives of property in store, and provides for their use to borrow money on; but the implication is clear that their use in that way by a factor for more than the value of his interest in the property would be wrongful and invalid against the owner. This we do not understand to be disputed by the counsel for the plaintiff in error. His claim is that there was in this case no pledge, but, "as the effect of the stipulation in the press

receipts," "an absolute transfer of the legal title to the insurance company by parties in possession having the absolute control of the property, and the security was thus taken to enable the insurance company to sell the cotton and reimburse themselves if the debt was not paid." The transaction between the parties was certainly not a sale, and in the answer of the company it is distinctly stated that the cotton was delivered into the possession of the company to be held as security for the payment of the notes given for the money borrowed. Undoubtedly the possession of the receipts was equivalent to the possession of the property, but the title which the company acquired was such as grew out of its contract with the factors. That clearly was a pledge and nothing more. There was, first, the cotton; second, the debt for the money borrowed; and, third, the delivery of the property into the possession of the creditor, to be held as security for the debt. These are all the elements of a pledge, and fix the rights of the parties. Aiken & Watt were the pledgors, but as they were only factors and had no interest in the property as against Kiger, the owner, their pledge was wrongful and invalid as to him. The pledge was by a factor of the property of his principal, in which he had no interest whatever, as security for his own debt.

2. As to Boyd & Co. They were simply warehousemen. Their duty under the law was not to issue receipts until they had the property actually in store, and not to deliver the property until the receipts were surrendered for cancellation. They did have the property in store when they gave the receipts, and as soon as it was taken from them by judicial process they notified the insurance company, and upon that notice the company is now here asserting its title. This is a substantial compliance with their obligation not to deliver without a surrender of the receipts. There is no pretence of fraud or collusion, and we think it would be a surprise to warehousemen to be told, that when they issued their receipts for property in store they became not only responsible as custodians of the property, but guarantors of its title to the assignees of their receipts. Such a rule would make it necessary for a warehouseman, before giving a receipt, not only to ascertain whether he had the property actually in store, but whether the title of the

bailor was valid and unincumbered. Certainly this could not have been in contemplation when warehouse receipts were made by statute negotiable and to some extent evidence of ownership. The duty of the warehouseman is performed when he gets the property into his own possession before he issues the receipt, and transfers that possession when demanded to the lawful holder of the receipt.

In this case the liability of Boyd & Co. is just what it would have been if the company had put the cotton in store and taken a receipt to its own order. The fact that Aiken & Watt originally stored the property is a matter of no importance so far as Boyd & Co. are concerned. The receipt in the hands of the company represented the cotton stored by Aiken & Watt, and gave the company the same rights it would have had if the cotton, instead of the receipt, had been handed over. The company got by the receipt such interest in the cotton as Aiken & Watt could by their pledge convey, and that is all Boyd & Co. agreed to deliver on the return of their receipt. Boyd & Co. cannot, as against the company, say they never had the cotton, or that they did not promise to deliver it on the return of their receipt by the lawful holder. They received the actual possession of the property from Aiken & Watt, and that possession they agreed to deliver to the insurance company when called on. This, as has just been seen, they have in legal effect done, and the rights of the parties in this case are to be determined precisely as they would be if the company had got the cotton from Boyd & Co., on the surrender of the receipts, and had afterwards been sued by Kiger for its possession.

*Judgment affirmed.*