### GEORGE *v.* FOURTH NAT. BANK OF LOUISVILLE.

*(Circuit Court, D. Kentucky. June 4, 1888.)*

1. FACTORS—PLEDGE—BONDED WAREHOUSE.
     A receipt for whisky stored in a bonded warehouse is not a "document of title," within the meaning of Act Ky. May 5, 1880, which provides that "every factor or other agent intrusted with possession of a document of title to merchandise shall be deemed the owner," so as to validate a sale or pledge of the property to an innocent third party, and which declares that any custom-house permit or warehouse receipt shall be deemed a document of title, since whisky in a bonded warehouse is subject to the regulations of congress, and is in charge of the officers of the government.

2. SAME.
     An agent to whom such a receipt had been given, for the purpose of borrowing money on it to pay the revenue tax, paid such tax himself, and, after attempting to export the whisky, stored it in a free warehouse, and then pledged the free warehouse receipt for his individual debt. The owner knew that the whisky had not been pledged to pay the tax, and that the agent had it "in store." *Held*, that the agent held the whisky, not as factor, but as creditor, and had no right, under said act, to pledge it.

3. SAME—WAREHOUSE RECEIPTS.
     An agent who receives ordinary warehouse receipts for the purpose of negotiating a certain loan for his principal on their security, and who after obtaining such loan by pledge of the receipts pays the loan himself without the knowledge of his principal, and thus repossesses himself of the receipts, has no authority under said act to pledge them for another loan, since, after his first pledge of the receipts, he was not "intrusted with" them again, within the meaning of the act.

At Law.

This case was submitted upon an agreed statement of facts. W. O. George was a citizen of Illinois, and the Fourth National Bank of Louisville, Ky., was a national banking corporation doing business at that place. The Newcomb-Buchanan Company was a Kentucky corporation, with its principal place of business at Louisville, Ky. Its business was that of a distiller of Kentucky whiskies and a dealer therein. On the 29th of September, 1884, it made a general assignment of all of its effects for the benefit of its creditors. The controversy in this case concerns certain 50 barrels of whisky known as "Anderson," made in June, 1880,

and designated by serial Nos. 28,195 to 28,244. The case divides itself into two parts: *First,* with respect to the 35 barrels of whisky, No. 28,-210 to No. 28,244; *second,* as to. the remaining 15 barrels, numbered 28,195 to 28,209. In the year 1880, George purchased from the New-comb-Buchanan Company 50 barrels of whisky, above mentioned. At the time of the purchase they were stored in the bonded distillery ware-house attached to the Anderson distillery, at Louisville, Ky., and were there held in pursuance of the requirements of the internal revenue laws of the United States, awaiting the coming due and payment of the excise tax provided by law. The Anderson Distilling Company was a Kentucky corporation engaged in making whisky. George paid the Newcomb-Buchanan Company for said whisky, and received from it 10 separate ware-house receipts of the Anderson Distillery Company, issued in the name of L. J. Haskins, and by him indorsed in blank; each warehouse receipt being for 5 barrels of whisky. These warehouse receipts were delivered by the Newcomb-Buchanan Company to the plaintiff, George. The following is a copy of one of said receipts, (the others being similar except as to numbers:)

"No. 2,514.

"THE ANDERSON DISTILLERY COMPANY. HAND-MADE SOUR-MASH WHISKY.

"LOUISVILLE, KY., June 9, 1880.

"Received in the Anderson Distillery Company's distillery bonded ware-house, No. 97, fifth district of Kentucky, for account and subject to the order of L. J. Haskins, St. Louis, Mo., deliverable only on return of this receipt properly indorsed, and on payment of government tax, $———, and storage at the rate of ten cents per bbl. per month from 15th July, '81, five barrels Anderson hand-made sour-mash whisky, entered into bond, as follows:

| Serial Number. | Wine Gallons. | Outs. | Volume. | Proof. | Gals. | Taxable Gals. | When Made. | Warehouse Stamp. | When Tax is Due. |
|---|---|---|---|---|---|---|---|---|---|
| 28,210 | 442 | 0 | ½ | 44 | 44 | | June, 1880 | R 3131682 | July 5, '83 |
| 1 | 442 | " | " | 44 | 44 | | " | " 3 | " |
| 2 | 442 | " | " | 44 | 44 | | " | " 4 | " |
| 3 | 442 | " | " | 44 | 44 | | " | " 5 | " |
| 28,214 | 442 | " | " | 44 | 44 | | " | 3131686 | " |
| | 2222 | | 2² | 220 | 220 | | | | |

*Storage on this ware-house re-ceipt paid 5th March, 1883.*

"This receipt is given in deference to the Kentucky warehouse law, as well as to the laws of the United States. Loss or damage by fire, the elements, shrinkage, or natural decay at owner's risk.

[Signed]                    "THE ANDERSON DISTILLERY COMPANY.
                              "By ANDREW BUCHANAN, President.

"Attest:
     [Signed]   "J. S. OSBORNE, U. S. Store-Keeper."

At the time George purchased this whisky from the Newcomb-Buchanan Company, that company agreed that it would arrange for George banking facilities for raising money to pay the tax when it should become due. This tax became due in June, 1883, and under the business regulations of the internal revenue department was collectible during the next 60 days; that is, during the months of July and August, 1883. For the purpose of arranging a loan to pay the tax, George forwarded by

mail from Chicago, to the Newcomb-Buchanan Company, the 10 warehouse receipts above mentioned, for the purpose of having the same regauged, and the tax paid thereon. The Newcomb-Buchanan Company prepared and sent to George a promissory note, made negotiable, and payable at the Bank of Kentucky, in Louisville, Ky., dated 9th August, 1883, and due six months after date, for the sum of $1,233. The note was the joint and several note of the Newcomb-Buchanan Company and George. The Newcomb-Buchanan Company discounted the said note, and used the money for paying the tax on the 35 barrels of whisky. The Newcomb-Buchanan Company had agreed with the bank of Kentucky to pledge for the security of the note the free warehouse receipts for the said 35 barrels. After the whisky was taken from bond, it was placed in a free warehouse belonging to the Newcomb-Buchanan Company, and a warehouse receipt issued therefor in due form to George. This warehouse receipt was sent to George, and was by him indorsed in blank, and sent to the Newcomb-Buchanan Company, for the purpose of having it delivered to the Bank of Kentucky, to be held as collateral security for the payment of the said note. This note having become due on the 12th February, 1884, a renewal of the same was made in the same way, the Bank of Kentucky retaining the warehouse receipts as collateral for the renewal note. This renewed note fell due on the 14th June, 1884. Before it fell due George authorized the Newcomb-Buchanan Company to sell other whiskies, which he owned, and which were in charge of the Newcomb-Buchanan Company, and apply the proceeds of such sale in payment of the renewal note. George at no time authorized the sale of any part of the 50 barrels of whisky. About the 7th June, 1884, in anticipation of the maturity of the renewal note, which was to become due on the 14th June, 1884, George signed a joint note for $1,233, and remitted it to the Newcomb-Buchanan Company, to be used in renewal of the said note so falling due on the 14th June, 1884. The Newcomb-Buchanan Company, without any information to the plaintiff, George, sold $182.74 of other whiskies belonging to George, paid that sum into the Bank of Kentucky as a credit on the debt of $1,233, leaving a balance of $1,066.26. On the 30th of June the Newcomb-Buchanan Company, without the knowledge of George, paid the Bank of Kentucky the residue of the said debt, and took up the said note, to-wit, the joint note of the Newcomb-Buchanan Company and George, and received from the Bank of Kentucky the warehouse receipts of the Newcomb-Buchanan Company so indorsed in blank by the said George. The Newcomb-Buchanan Company then removed the whisky from its free warehouse, and stored the same in the warehouse of Daniel E. Doherty, receiving a warehouse receipt in the usual form, to its own order. This warehouse receipt it indorsed in blank, and pledged it with the Fourth National Bank of Louisville, to secure a loan made at the time for the sum of $2,100. The Fourth National Bank was entirely ignorant of any right of the said George to the said whisky, and George was entirely ignorant of the fact that the note had not been renewed, and of what had been done by the Newcomb-Buchanan Company with the whisky.

Upon the failure of the Newcomb-Buchanan Company, George discovered the whereabouts of his whisky, and, having so discovered the same, tendered to the Fourth National Bank the sum of $1,081.73, being the amount paid on George's note by the Newcomb-Buchanan Company, with interest.    The questions in this case as to the 35 barrels were whether or not this tender was a sufficient one, and whether the Fourth National Bank was bound to deliver the whisky to George upon that tender.

As to the 15 barrels of whisky:    At the same time George transmitted the warehouse receipts for the 35 barrels of whisky, as above mentioned, he sent also the warehouse receipts for the other 15 barrels.    The Newcomb-Buchanan Company did not forward any note for his signature with a view to its discount and paying the tax on the 15 barrels of whisky, nor did it at any time report the payment of that tax.    On August 10, 1883, George, writing to the Newcomb-Buchanan Company, inquired as follows:

"What has become of the other 15 barrels?    There were fifty barrels in all, and you seem only to have unbonded 35 barrels.    Please send to me papers covering the whole; that is to say, I would like one statement of the whole fifty barrels, when you shall have freed it all."

The Newcomb-Buchanan Company did not render any such statement, but on the margin of the letter to George dated 19th August, 1883, made the following statement, signed by the initials "G. C. B.,"—that is, George C. Buchanan, who was president of the Newcomb-Buchanan Company:    "We will arrange for the payment of tax on the other 15 barrels in a few days."    On February 12, 1884, George was informed by the Newcomb-Buchanan Company, by letter, that it had this whisky "in store here."    The Newcomb-Buchanan Company, instead of paying the government tax on the said 15 barrels of whisky, arranged, without the knowledge of George, to export the same to Canada, in bond.    At the Canada frontier the custom officials of the dominion of Canada refused to permit the 15 barrels, or any part of it, to enter the dominion, because it was contained in packages of less than 100 gallons.    Thereupon the Newcomb-Buchanan Company brought the whisky back to Louisville, and paid the tax thereon, and stored the same in the free warehouse of Daniel E. Doherty, taking a warehouse receipt from him in the name of the Newcomb-Buchanan Company.    This warehouse receipt it indorsed in blank, and pledged the same to the Fourth National Bank for a loan of $1,500.    After February, 1884, George made no further inquiry in reference to this 15 barrels of whisky, and did not discover its whereabouts until the 20th September, 1884, which was after the failure of the Newcomb-Buchanan Company; and then, having discovered it, he tendered to the Fourth National Bank the sum of $500.40, the amount paid by the Newcomb-Buchanan Company to free the whisky. The Fourth National Bank was ignorant at the time it took this whisky in pledge of any claim of George, and George, up to the time of his said tender, was ignorant as to what had been done with the whisky.

*John Mason Brown* and *Geo. M. Davie*, for plaintiff.

*Walter Evans* and *Alex. P. Humphrey*, for defendant.

JACKSON, J., (*after stating the facts as above.*)   It is conceded by plaintiff's counsel that, under the foregoing state of facts, the defendant has a valid equitable lien upon the 50 barrels of whisky in question, to the extent of the claim which the Newcomb-Buchanan Company held against him, growing out of the advances or payments made by them for his benefit, consisting of the two sums of $500.40, with interest thereon from January 29, 1884, and $1,100, tendered the bank, November 12, 1884.   The controverted question between the parties is whether defendant can hold the whisky, as against the plaintiff, for the full amount of its demands against the Newcomb-Buchanan Company for the security of which the warehouse receipts were pledged by the latter.   If this question rested upon the general rules of law relating to the right of an agent or factor to pledge the property of his principal for his own debt, it would be easily resolved against the defendant.   But its correct determination in this case depends upon the proper construction of two acts of the legislature of Kentucky in connection with certain provisions of the general revenue laws of the United States.   The first of said Kentucky acts is that "relating to warehousemen and warehouse receipts," approved March 6, 1869, the sections of which material to this case are the following:

"(1) That hereafter in this state all and every person or persons, firms, companies, or corporations, who shall receive cotton, tobacco, pork, grain, corn, wheat, rye, oats, hemp, whisky, coal, or any kind of produce, wares, merchandise, commodity, or any other kind or description of personal property, or thing whatever, in store, or undertake to receive or take care of the same, with or without compensation or reward therefor, shall be deemed and held to be warehousemen.   (2) That every warehouseman receiving anything enumerated in section one of this act shall, on demand of the owner thereof, or the person from whom he receives the same, give a receipt therefor, setting forth the quality, quantity, kind, and description thereof, and which shall be designated by some mark, and which receipt shall be evidence in any action against said warehouseman.   (3) All receipts issued by any warehouseman, as provided by this act, shall be negotiable and transferable by indorsement in blank, or by special indorsement, and with like liability as bills of exchange now are, and with like remedy thereon."   "(5) That no warehouseman or other person shall issue any receipt or voucher therefor or for any goods, wares, merchandise, produce, commodity, property, or other thing, of any description or character whatever, to any person, persons, company, companies, corporation, or corporations, as security for any money loaned or other indebtedness, unless such goods, wares, merchandise, produce, commodity, property, or other thing so receipted for shall be at the time of issuing such receipt or voucher the property, without incumbrance, of said warehouseman; and, if incumbered by prior lien, then the character and extent of that lien shall be fully set forth and explained in the receipt, and shall be actually and in fact in store and under the control of said warehouseman at the time of giving such receipt or voucher."   "(7) That no warehouseman or other person shall sell or incumber, ship, transfer, or in any manner remove beyond his immediate control, any goods, wares, merchandise, produce, commodity, property, or chattel, for which a receipt or voucher shall have been given, without the written consent of the person or persons holding such receipt, and the production of the receipt."

The second of said acts is entitled "An act to declare and amend the law relating to principals and factors or agents," approved May 5, 1880, which contains the following provisions applicable to the present controversy, viz.:

"(1) Be it enacted by the general assembly of the commonwealth of Kentucky: Every factor or other agent intrusted with the possession of a document of title to merchandise, or with the possession of merchandise, shall be deemed to be the true owner thereof, so far as to give validity to any contract made by such factor or other agent with any other person for the sale or disposition of the whole or any part of such merchandise for any money paid or advanced, or negotiable instrument given, or existing security surrendered, by such other person. (2) Where any person shall take any such merchandise or document therefor from any such agent, as a security for any antecedent debt or demand, he shall not thereby acquire any right or interest therein other than was possessed or might have been enforced by such agent at the time of such transfer, or than the value of any security surrendered at the time of such transfer, whichever may be greatest. (3) The sale or disposition provided for in the first section of this act shall not be valid in favor of any person who at the time he. shall advance or pay said money, or give said negotiable instrument, or surrender such security, shall have notice that such factor or agent is acting in violation of his authority. (4) Nothing contained in this act shall be taken to authorize a common carrier or warehouseman, who is not a factor or dealer in merchandise, to whom merchandise may be intrusted for transportation or storage only, to sell or hypothecate the same; and nothing contained in this act shall be taken to authorize any person to sell or hypothecate any merchandise in his possession upon which he has issued a warehouse receipt." "(6) Any custom-house permit, warehouse receipt, or other document, used in the ordinary course of business as proof of the possession of merchandise, or authorizing, or purporting to authorize, either by indorsement or delivery, the possessor of such document to transfer or receive the merchandise thereby represented, shall be deemed a document of title, in the meaning of this act; and a factor or other agent shall be deemed intrusted with such document, whether the same is derived by him from such owner, or obtained by him by reason of having had the possession of said goods, or some other document of title."

In connection with these provisions of the Kentucky law should be noticed certain provisions of the internal revenue laws of the United States, in order to clearly understand the situation of the property about which the controversy arises. By section 3271, Rev. St., every distiller is required, at his own expense, to provide a warehouse, to be situated on and to constitute a part of his distillery premises, to be used only for the storage of distilled spirits of his own manufacture, until the tax thereon shall have been paid; and such warehouse, when approved by the commissioner of internal revenue on report of the collector, is "declared to be a bonded warehouse of the United States, to be known as a distillery warehouse, and shall be under the direction and control of the collector of the district, and in charge of an internal revenue store-keeper, assigned thereto by the commissioner." By sections 3273 and 3274, such store-keeper has charge of the warehouse to which he is assigned, said warehouse being in the joint custody of the store-keeper and the proprietor thereof; and no articles shall be received in or delivered from

such warehouse, except on an order or permit addressed to the store-keeper, and signed by the collector having control of the warehouse.   By section 3288, it is provided that no distilled spirits on which the tax has been paid shall be stored or allowed to remain on any distillery premises, under the penalty of a forfeiture of all spirits so found.

It is shown by the statement of facts that the 50 barrels of whisky in controversy were, in June, 1880, stored in the distillery bonded warehouse of the Anderson Distillery Company, by whom it was manufactured.   That said company issued to L. J. Haskins its receipt therefor, attested by J. S. Osborne, the United States store-keeper in charge of said warehouse and spirits, specifying that the whisky was deliverable only on the return of said receipts, and the payment of the government tax and storage on the same.   This government tax was due and payable in August, 1883.   Prior to that time the plaintiff had become the owner of said receipts so issued to Haskins, and entitled to the whisky represented thereby, under some arrangement or agreement with the Newcomb-Buchanan Company that the latter should aid or assist him in raising the money, when required to pay the government tax.   Spirits so deposited in a bonded warehouse of the United States are frequently sold by the distiller or other owner subject to tax, but while they remain in such warehouse of the United States, under the control of officers and agents of the government, they are subject to all the provisions of the internal revenue laws, and regulations made in pursuance thereof.   The whisky in question, while thus stored, was liable, not merely for the specific government tax thereon, but for all lawful assessments made against the distiller or distillers in connection with the business.   *Hartman* v. *Bean*, 99 U. S. 393–397.

Under the provisions of the law, it could not be delivered from this bonded warehouse of the United States, except on payment of the government tax, and "on an order or permit addressed to the store-keeper thereof, and signed by the collector having control of the warehouse."   Nor could the whisky remain in such warehouse on storage, after the tax was paid, without incurring the penalty of forfeiture.   In respect to this whisky, the Anderson Distillery Company did not, and could not, under the law, occupy the position of a free or private warehouseman.   While the tax was unpaid and the whisky remained in this warehouse, it was subject to regulations prescribed by the act of congress, and its place of storage was an agency of the general government, and subject to the authority and control of officers and agents of the United States.   The premises in which the whisky was stored, being a bonded warehouse of the United States, and an agency of the government, where unbonded or free whisky could not be received or allowed to remain on storage without liability to forfeiture, do not come within the provisions of the Kentucky statutes above referred to, relating to warehousemen and warehouse receipts, and the law relative to principals and factors or agents.   It cannot be assumed that the legislature of Kentucky undertook to regulate the duties and obligations of a bonded warehouse of the United States, created and established for the protection and security of their own rev-

cnues, and in which free whisky could not remain without incurring the penalty of forfeiture.

The Kentucky acts manifestly refer to warehousemen and warehouse receipts, and to principals and factors, over whom the state of Kentucky possessed authority, and could exercise lawful jurisdiction. Instrumentalities and agencies of the United States, such·as the bonded warehouses established and employed by them for the due and proper enforcement of their internal revenue laws, and subject to their exclusive regulation, do not come legitimately within the scope of the above-quoted acts of the Kentucky legislature. The Kentucky laws apply to ordinary warehousemen and warehouse receipts, and the relations between principals and factors, over whom, and whose duties and obligations to each other and to the public, the state may properly exercise her authority. In respect to the 50 barrels of whisky in question, and while the government tax thereon remained unpaid, the Anderson Distillery Company was not a Kentucky warehouseman, who could lawfully receive and issue receipts for free whiskies, but was a governmental agency, for the custody of specific property, on which the United States had a lien for taxes, and the right of possession till such taxes were paid, when its removal from such place of storage was required by the law of congress. Receipts issued by such an agency of the United States are not warehouse receipts, under the Kentucky act of March 6, 1869; nor is the relation between such a custodian and that of the beneficial owner of the whisky that of principal and agent, within the meaning of the Kentucky act of May 5, 1880. When, therefore, the Anderson Distillery Company issued receipts for the whisky thus stored in a bonded warehouse of the United States, and subject to their control and custody, such a receipt, whatever may be said of the authority of this government agency to issue the same, did not constitute warehouse receipts or documents of title, in the sense in which those terms are employed in the Kentucky act. The company, in respect to such whisky, was not a warehouseman, under or subject to the laws of Kentucky, and the evidences as to ownership of such whisky which it might issue, subject to the rights of the government, were not such receipts as are contemplated· or covered by the warehouse or factors' acts of Kentucky. The plaintiff, in forwarding these original receipts to the Newcomb-Buchanan Company to enable them to .arrange for the payment of the government tax, and free the whisky from the claim and possession of the government, did not intrust his said agents with such possession of the property, or of such a document of title thereto, as will bring the case within the operation of the Kentucky statutes above cited.

This view of the subject is of no special importance in respect to the controversy over the 35 barrels of whisky. The original receipts, to the extent of said 35 barrels, were surrendered by the Newcomb-Buchanan Company in June, 1883, when the government tax thereon was. paid, and the new free warehouse receipts of the Newcomb-Buchanan Company were issued to George for said 35 barrels, which receipts, after being indorsed in blank by him, were forwarded to the Newcomb-Buchanan

Company as his agents, to be pledged as collateral to the defendant for the loan of $1,233 on the joint note of plaintiff, and his said agents, the Newcomb-Buchanan Company. These new receipts, so issued to George after the 35 barrels were released from bond, clearly came within the operation of said Kentucky acts; and if, after they were indorsed by him, and returned to his said agents, the Newcomb-Buchanan Company, even for a special purpose, the latter had misapplied them, and pledged or hypothecated them to innocent parties, to secure loans or advances to themselves, the plaintiff's rights would no doubt have been affected by the provisions of the Kentucky factors' act. But the Newcomb-Buchanan Company, as plaintiff's agent, did not make any wrongful or improper use of said receipts in the first instance. They properly executed the trust of their agency, by delivering those new free warehouse receipts to the defendant, in pursuance of the agreement and understanding of the parties, as collateral security for the joint note of plaintiff and themselves. Their relation to the note, as between themselves, being that of surety for the plaintiff, when those receipts were placed in the possession of the bank as collateral for the loan, the agency of the Newcomb-Buchanan Company in respect to said documents of title, and the whisky represented thereby, so stored with them, ceased. The purpose for which the receipts had been intrusted to the Newcomb-Buchanan Company were accomplished, and their agency for plaintiff in respect to the same then terminated. When the Newcomb-Buchanan Company, on the 30th June, 1884, paid the bank the balance of $1,066 then due on the renewed note, and took up said receipts, without the request, knowledge, or consent of George, did their voluntary act in making such payment, and thereby regaining possession of the receipts, have the effect and operation of restoring or re-establishing their former agency relation towards the plaintiff in respect to said receipts? This is the contention of the defendant's counsel, but the position cannot be maintained without disregarding well-settled legal principles, and extending the provisions of the Kentucky factors' act far beyond what the legislature contemplated in its passage.

Assuming that the Newcomb-Buchanan Company, in virtue of their connection with the note, and relation of surety thereon for George, and in disregard of his wishes, had the right to pay off the note, and receive possession of the collateral from the bank, in what character or capacity did they thereafter hold such collateral? Certainly not as the agents of George. The bank, from whom the Newcomb-Buchanan Company received the receipts, held them in no agency relation such as the factors' act contemplates. The holder of a collateral, as security for the payment of a debt, is hardly to be held and treated as an agent or factor of the debtor, within the true meaning of the act of May 5, 1880, even though such collateral should be in the shape of a warehouse receipt. In paying off the note and taking up the receipts, the Newcomb-Buchanan Company were simply substituted or subrogated to the rights of the bank. They thereafter held the note and the collaterals as creditors of George, for whose benefit, as their principal, the payment had been

made. This payment merely created between themselves and George the new relation, by operation of law, of creditor and debtor, and conferred upon them, at most, only the right to hold such receipts as creditors until the amount so advanced for George should be refunded. In no just sense can it be said that the possession of warehouse receipts issued by themselves, thus acquired by the Newcomb-Buchanan Company, would operate to constitute them the factors or agents of George. How can it be said, with any show of reason or propriety, that these documents of title, obtained under such circumstances, were intrusted to them as the factors or agents of George? . What was the agency upon which the Newcomb-Buchanan Company held George's documents of title, whose possession was procured without his knowledge and consent? As creditors, they had the right to hold them until their advances were returned; but no relation of factor or agent was either created or revived when they by their own act repossessed themselves of plaintiff's receipts. While holding plaintiff's receipts, not as agents, but merely as self-constituted creditors, they wrongfully, and in fraud of his rights, cancel the same, store the whisky in the warehouse of Daniel E. Doherty, and take receipts therefor in their own name, which they pledge to defendant for a debt of their own.

It is not pretended that these Doherty receipts, which the bank now holds, and under which it claims the 35 barrels of whisky for the security of its loan to the Newcomb-Buchanan Company, were ever intrusted by plaintiff to the Newcomb-Buchanan Company, as his factors or agents. But it is said that the Newcomb-Buchanan Company was enabled to obtain these warehouse receipts of Doherty, because they were intrusted by plaintiff with the receipts issued by themselves; but, as we have already shown, this position is not correct, and the case comes down simply to this: that a warehouseman who has issued his receipts for goods placed in his possession on storage, while such receipts are still outstanding, wrongfully, fraudulently removes the goods from his own to another warehouse, where they are stored in his own name, and the receipts taken therefor are pledged for his own debts. There is nothing in the sixth section of the factors' act of May 5, 1880, to give validity to rights acquired under such conduct, or divest the rights of the true owner. This action of the Newcomb-Buchanan Company, under the facts of this case, not only finds no support in the provisions of section 6 of said act, but comes within the express inhibition of the last clause of section 4 of said act, which provides that "nothing contained in this act shall be taken to authorize any person to sell or hypothecate any merchandise in his possession upon which he has issued a warehouse receipt." Neither the fact that the defendant was innocent, and knew nothing of the fraudulent acts of the Newcomb-Buchanan Company, nor the fact that such receipts as were issued by Daniel E. Doherty for the 35 barrels of whisky are made negotiable instruments by the act of March 6, 1869, can in any way affect the plaintiff's rights or operate to divest his title to the whisky, or confer upon the bank any right thereto beyond what the Newcomb-Buchanan Company could have lawfully asserted

against the same. The defendant's right in respect to the 35 barrels of whisky, under the facts stated, are only such as the Newcomb-Buchanan Company could have enforced, as against the plaintiff. The negotiability of the receipts taken by defendant, and its innocence in the transaction, in no way enlarge its rights. *Insurance Co.* v. *Kiger*, 103 U. S. 352–357.

In respect to the 35 barrels of whisky, the conclusion of the court is that the plaintiff is entitled to the same upon paying to the defendant the sum of $1,100, which was tendered it November 12, 1884.

In respect to the 15 barrels of whisky, as already indicated, the original receipts which plaintiff forwarded to the Newcomb-Buchanan Company, for the purpose of having them pay the government tax thereon, were not such warehouse receipts as were contemplated by and embraced within the Kentucky acts relied on by defendant. Not coming within the operation of those acts, defendant, under the facts stated, acquired no rights in or to this 15 barrels beyond what the Newcomb-Buchanan Company could have claimed and asserted, which was the repayment of the government tax, amounting to $500.40, with interest thereon since January 29, 1884. But aside from the consideration that the original receipts which plaintiff placed in the hands of the Newcomb-Buchanan Company for the special purpose of freeing the whisky from bond do not properly come within the provisions of the Kentucky acts, so as to be governed and controlled by their provisions, how stands the case as to the 15 barrels? The Newcomb-Buchanan Company first fraudulently, and in violation of plaintiff's rights, asserted ownership of those 15 barrels, and attempted to export the same to Canada. Failing in this scheme of wrongful and fraudulent appropriation of the property, it is returned to Louisville, and in January, 1884, the government tax thereon is paid by the Newcomb-Buchanan Company, and thereupon the whisky is released from the custody and control of the government officials and agency, and passes into the possession of the Newcomb-Buchanan Company without any definite or special instructions from plaintiff as to with whom or how it should be stored. It is going quite far to say that their special agency to pay the tax and free the whisky from bond continued· after their fraudulent removal of the property, and wrongful attempt to export it. But assuming that it did, and that their agency continued or was revived upon the return of the whisky to Louisville, when did such agency terminate? The original receipts issued by the Anderson Distillery Company were no doubt given up when the tax was paid. This payment was not made at the time or in the manner directed by the plaintiff; nor was any place of storage designated by him for the whisky after it should be freed from the bonded warehouse of the United States.

In what capacity, then, did the Newcomb-Buchanan Company hold this whisky, after executing their special agency of paying the government tax thereon? Their agreement with plaintiff to arrange or provide for the payment of this tax had no connection with their character as warehousemen, or as factors or dealers in such merchandise. When

plaintiff asked or accepted their assistance in arranging or paying the tax, did he thereby make them his factors or agents to deal with and control the property itself, within the meaning of the factors' act? Such a construction would, it seems to me, extend the scope and purpose of the act far beyond what its language and general intent will justify or warrant. The most that can be claimed for the Newcomb-Buchanan Company in connection with this lot of 15 barrels is that upon paying the government tax, by way of an advance for the plaintiff, they became substituted to the lien of the general government on the whisky for the amount so advanced, and that they thereafter held the whisky, not as factors or agents for the plaintiff in the true sense of the Kentucky act, but as creditors who had acquired a lien thereon, and a right to hold possession till such lien was satisfied. Any claim of ownership or right to deal with the property beyond this was fraudulent and wrongful on the part of the Newcomb-Buchanan Company, and could neither confer nor divest rights. If the pledge of the Doherty receipts for the 15 barrels wrongfully stored in the name of the Newcomb-Buchanan Company could be sustained to the extent claimed for the defendant, it would follow that any person in possession of personal property by way of security for debt, or by fraud or theft, could store the same in a warehouse in his own name, take receipts from the warehouseman therefor, then pledge such receipts to an innocent party for value, and thus divest the title, right, and interest of the true owner in and to the property so wrongfully converted.

The act relied on to sustain such a claim never was intended to cover such a transaction. It cannot affect the question, or prejudice the right of the plaintiff, that such receipts as Doherty gave to the Newcomb-Buchanan Company are made negotiable; for Doherty's negotiable paper, based upon property stored with him by a person having no right to pledge the property itself, cannot defeat or impair the rights of the true and lawful owner. The statute of Louisiana made such receipts negotiable instruments, but the supreme court, in the case of *Insurance Co. v. Kiger*, 103 U. S. 352–357, held that the owner's rights were not defeated by the wrongful act of an agent in pledging such receipts for his own debts, although the pledgee was an innocent holder for value. The cases cited by counsel for defendant do not support their contention, as applied to the facts of the present case, which is clearly distinguishable from *Steam-Boat Co. v. Scudder*, 2 Black, 373, and other like decisions relied on by defendant. There is nothing in the Kentucky acts which would or could, under the facts of this case, properly defeat the plaintiff's right to recover these identical 15 barrels of whisky from the warehouseman Doherty. In the judgment of the court, it is clear that the plaintiff is entitled to said 15 barrels of whisky upon paying to the defendant the sum of $500.40, with interest thereon from January 29, 1884; said sum and interest being the only valid claim which the defendant, as between itself and plaintiff, has or can assert against said whisky. Judgment will accordingly be rendered in favor of plaintiff for the two lots of whisky, subject to the claim of the defendant for the two

amounts hereinbefore indicated.    The costs of the said suit will be divided.

BARR, J., (*dissenting in part.*)    It is quite clear, from the statement of facts, that the Fourth National Bank made the loans and received the pledge of the 35 barrels and the 15 barrels of whisky without knowledge or suspicion that the whisky did not belong to the Newcomb-Buchanan Company; and it is equally clear that, as between that company and George, the company had no authority to make the pledges, except as to the extent of its lien for taxes advanced in unbonding the whisky. This settles the question against the Fourth National Bank, unless the Kentucky factors' act, as it is called, entitles the bank to a recovery to the extent of its debts, or, rather, to the value of the whisky, if not beyond the extent of the debts.    It is claimed that the Newcomb-Buchanan Company in this transaction was not within the provisions of the factors' act, and is expressly excluded by the fourth section, which enacts that "nothing contained in this act shall be taken to authorize a common carrier or warehouseman, who is not a factor or dealer in merchandise, to whom merchandise may be intrusted for transportation or storage only, to sell or hypothecate the same; and nothing contained in this act shall be taken to authorize any person to sell or hypothecate any merchandise in his possession upon which he has issued a warehouse receipt."    The Newcomb-Buchanan Company was not merely a warehouseman, but "its business was that of a maker or distiller of Kentucky whiskies, and a dealer therein," and it did in fact sell whiskies for George; therefore the first part of this section has no application. Neither is the latter part applicable.    It may be argued that this part of the section applies only to merchandise in actual possession, and not to documents of title, but, be that as it may, the language can, we think, only include merchandise in possession, upon which there is an outstanding warehouse receipt given by the person who has the possession of the merchandise.    In this case, the 35 barrels of whisky for which the Newcomb-Buchanan warehouse had issued warehouse receipts had been removed to Doherty's warehouse, and the warehouse receipts executed by the Newcomb-Buchanan Company were returned and canceled. Reading the first and sixth sections of this act together, the case turns upon the question of whether or not the warehouse receipts pledged were "intrusted" to the Newcomb-Buchanan Company by George, within the meaning of this act.    The original warehouse receipts given for the whisky in bond were sent to the company by George in July, 1883, for the purpose of raising the money necessary to pay the tax, and take the whisky out of bond.    Thirty-five barrels of this was unbonded, and put in the Newcomb-Buchanan free warehouse, and receipts issued to George.    These were pledged to the Bank of Kentucky to secure the joint and several note of George and the company for $1,233.    With the proceeds of this note, the 35 barrels of whisky were freed from the tax.    Thus far the company acted strictly within its authority, and the Bank of Kentucky became the actual custodian of these receipts pledged

to it. But the natural inquiry is, what was the relation of the company towards these receipts at the time the note was paid the bank by it and the receipts taken in? Did the company receive these warehouse receipts as George's agent? It was entitled to be substituted in the bank's stead when it paid the note as the surety of George, but this right, in the absence of any agency, arose from the company's being George's surety, and possession thus obtained would not be "intrusted," within the meaning of the statute. The company was intrusted with the original receipts, for the purpose stated, and was intrusted with the receipts issued for the whisky when freed from the tax, for the purpose of pledging them to the Bank of Kentucky, but only receipts for 35 barrels were actually pledged. In the correspondence between George and the company in July, 1883, George expresses a strong desire to sell a part of this whisky to pay the tax, instead of borrowing money for that purpose; and requests in a letter to the company that "when an opportunity may offer for the sale of, say, 25 bbls., please report it, and price, to me;" but I do not find that George actually authorized the company to sell any part of this whisky without further authority from him. He did, at the maturity of the note in June, 1884, authorize the company to sell other whiskies which he owned, and which were in the possession of the company, and to apply the proceeds of sale to the payment of this note. The company was the agent of George to pledge the receipts to secure the note executed to the Bank of Kentucky, and it may be insisted that, considering the company's other relations to George as stated in the agreed facts, the company's agency continued for the purpose of receiving from the bank these receipts whenever the note was paid. Undoubtedly, had the company sold the other whiskies as authorized, and applied the proceeds to the payment of the note, and thereupon received from the bank these receipts, it would have been as the agent of George, and George would have intrusted the company with the receipts; but the mere fact that the company had been the agent of George to pledge these receipts to the Bank of Kentucky, and continue the pledge by delivering the renewal notes, did not authorize the company to receive these pledged receipts as the agent of George, when it paid the note, without his knowledge or authority. I conclude, therefore, that these warehouse receipts were not intrusted to the company by George, within the meaning of the first section of the factors' act, and that the Fourth National Bank is only entitled to a lien for the amount of note, ($1,233,) with interest.

The receipts representing the 15 barrels of whisky were sent to the Newcomb-Buchanan Company, so the whisky might be unbonded. These were sent at the same time as the other receipts, and for the same purpose. The company made an attempt to export this whisky, but failed, and, upon its return from the Canadian border, paid the tax, but did not put it into one of its own warehouses, but carted it from the cars directly to Doherty's warehouse, and took a warehouse receipt in its own name. This receipt was subsequently pledged to the Fourth National Bank. The correspondence between George and the company

proves that George knew this whisky had not been pledged to the Bank of Kentucky, and that the company would make other arrangements to pay the tax which was then due. This was in August, 1883, and on the 12th February, 1884, George was informed by letter that the company had this whisky "in store here." There does not appear to have been any directions from or inquiry made by George after this, about the whisky, until after the company's failure, in the fall of 1884. Doherty's receipt is dated February 25, 1884, and was pledged to the Fourth National Bank in June, 1884, which was long after George knew the company held this whisky "in store," and when he knew that, he did not have either the Newcomb-Buchanan Company's or any other warehouse receipt in his possession for this whisky. After the receipt of the letter of the 12th February, 1884, George acquiesced in the company's holding "in store" his whisky without giving him its or any other warehouse receipt. The warehouse receipt of Doherty, which was pledged, was obtained by reason of the possession of this whisky which George intrusted the company with, and is clearly within the factors' act. I therefore conclude that the Fourth National Bank's lien on the 15 barrels of whisky is valid, to the extent of the debt of $1,500, for which it was pledged by the company, and to this extent dissent from the conclusions of Judge JACKSON.