LAND, J.
 

 Plaintiff is a cotton planter residing in Concordia parish in this state.-
 

 Defendant W. B. Thompson & Co. is a commercial partnership, domiciled in the city of New Orleans, and formerly engaged in the business of factor and commission merchant.
 

 During the years 1925, 1926, and 1927, plaintiff shipped to Thompson & Co. a total of 681 bales of cotton, which had not been accounted for up to the death of W. B. Thompson, head of the firm, on August 11, 1928.
 

 Shortly thereafter plaintiff made a demand for the return of his cotton. Warehouse receipts for only 159 bales were turned over to him. He was informed by persons in charge of the affairs of the late firm of W. B. Thompson & Co. that they were unable to deliver the balance of the cotton, as warehouse receipts for 226 bales and 296 bales had been pledged by W. B. Thompson & Co. for indebtedness of the firm to the defendants Canal Bank & Trust Company and to the Hibernia Bank & Trust Company, respectively.
 

 Plaintiff made demand upon the banks for the delivery to him of this cotton, valued at $90 per bale, and also of the warehouse receipts held by the banks. This demand was refused, and on September 17, 1928, the present suit was filed, accompanied by writs of sequestration, to recover the cotton or its value against W. B. Thompson & Co., as a partnership, against Mrs. Florence Thompson Fulton, as an individual member of the partnership, against the Hibernia Bank & Trust Company and Andrew J. McQuillan, as executors of W. B. Thompson, deceased, and against the Hibernia Bank & Trust Company and the Canal Bank & Trust Company, as pledgefes of the warehouse receipts by W. B. Thompson
 
 &
 
 Co.
 

 The sole defense of Mrs. Florence Thompson Fulton is that she is not a member of the partnership of W. B. Thompson & Co.
 

 The defense of the Hibernia Bank & Trust Company and Andrew J. McQuillan, executors of W. B. Thompson, deceased, is-that plaintiff authorized Thompson to carry the cotton in Thompson’s own name; to store it in public warehouses in the name of W. B. Thompson; to receive warehouse receipts in the name of W. B. Thompson, and that bills of lading evidencing the shipment of the cotton were made by plaintiff to Thompson or his firm, directly, and with authority to
 
 *255
 
 the warehouses to issue receipts in Thompson’s name. And, finally, that plaintiff not only acquiesced in Thompson’s treating the cotton consigned by plaintiff as Thompson’s own cotton, but authorized him in writing so to do on repeated,occasions.
 

 The defense of the Hibernia Bank & Trust Company and the Canal Bank & Trust Company is similar to that made by the executors of W. B. Thompson, deceased, with the additional defense that the banks accepted the warehouse receipts covering the cotton in good faith and for value in due course from W. B. Thompson & Co., and that, consequently, their pledge should be upheldl
 

 Plaintiff charges that the pledge to the banks was and is invalid because W. B. Thompson & Co. had no title, and had no ability or authority to convey title, to or otherwise dispose of the cotton of plaintiff, nor to store it under negotiable warehouse receipts, nor was the possession or custody of such receipts ever intrusted to W. B. Thompson & Co. by plaintiff.
 

 Plaintiff also charges that the pledge is invalid because defendant banks were charged with notice and put upon inquiry of the fact that the cotton and warehouse receipts therefor did not belong to W. B. Thompson & Co., but to plaintiff, or one of the customers of that firm.
 

 Upon these issues the case went to trial in the lower court, and judgment was rendered in solido against all the defendants in the sum of $14,884.32, with 5 per cent, interest thereon from judicial demand, September 18, 1928, the judgment in so far as' the succession of W. B. Thompson is concerned to be payable in due course of administration.
 

 Judgment was also rendered in solido in favor of plaintiff against all the defendants in the sum of $19,494.48, with 5 per cent, interest thereon from judicial demand, September 18, 1928, the judgment in so far as the succession of W. B. Thompson is concerned to be payable in due course of administration.
 

 Judgment was further rendered for plaintiff against the defendants in solido for all costs, and the rights of the parties defendant among themselves, arising from the .judgment, or from any payments thereon, or in execution thereof, were reserved.
 

 1. The testimony in the case is conflicting as to whether or not Thompson & Co. was authorized to store plaintiff’s cotton and obtain negotiable warehouse receipts in that firm’s name, and to use these receipts to secure loans of the Thompson Company. As the trial judge is the best judge of the credibility of the witnesses who appear before him, we feel that we should adopt on this question the following facts as found by him: “Plaintiff was not aware that his cotton had been so pledged until after Mr. Thompson’s death, and had never authorized that to be done. I am unable to give controlling effect to the testimony of Mr. Mc-Quillan and Mr. Harry Thompson on this point. Very plainly both of them were devoted to their dead chief, and intent on protecting his memory. It is highly improbable that the plaintiff, who had only business relations with Mr. W. B. Thompson, would have volunteered permission for the latter to use his cotton to secure loans of the Thompson Company, in which the plaintiff had no interest or concern, as they say he did. And since the plaintiff denies flatly and catego
 
 *257
 
 rically that he ever gave such permission or knew of such use of his cotton, and considering the testimony of Mr. S. J. Maxwell, his brother, I must hold that on this question the preponderance of evidence favors the plaintiff’s case.”
 

 In Lallande v. His Creditors, 42 La. Ann. 710, 7 So. 895, 896, the court said: “Under the Civil Code, a debtor may give in pledge whatever belongs to him, (Rev. Oivil Code, art. 3142,) but he cannot pledge for his own debt the property of another without the express or tacit consent of the owner; and, if the consent be tacit, it must be inferred from the circumstances so strong as to leave no doubt of the owner's intention; as if he was present at the making of the contract, or if ‘he himself delivered to the creditor the thing pawned.’ Id., art. 3146.”
 

 See, also, Hadwin v. Fisk, 1 La. Ann. 74; Bonniot v. Fuentes, 10 La. Ann. 70; Young v. Scott & Cage, 25 La. Ann. 313; Holton & Winn v. Hubbard & Co. et al., 49 La. Ann. 739, 22 So. 338; Stetson, Avery & Co. v. Gurney, 17 La. 164; Miller v. Schneider & Zuberbier, 19 La. Ann. 300, 92 Am. Dec. 535; Stern Bros. v. Germania National.Bank, 34 La. Ann. 1120.
 

 The Uniform Warehouse Receipts Act (Act No. 221 of 190S) prescribes:
 

 “Section
 
 40.
 
 — Who-
 
 May Negotiate a Receipt.
 
 — A negotiable receipt may be negotiated—
 

 “(a.) By the owner thereof; or
 

 “(to.) By any person to whom the possession or custody of the receipt has been entrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been entrusted, or if at the time of such entrusting the receipt is in such form that it may be negotiated by delivery.”
 

 As the negotiable warehouse receipts were not taken out in the name of W. B. Thompson
 
 &
 
 Co., with the knowledge or consent of plaintiff, who never learned of their existence until Mr. Thompson’s death, it is quite clear that plaintiff did not intrust these receipts to W. B. Thompson
 
 &
 
 Co. for any purpose whatever. It is not pretended that these receipts were negotiated by plaintiff as pwner.
 

 Section 41 of the Warehouse Receipt Act declares that: “A person to whom a negotiable receipt has been duly negotiated acquires thereby—
 

 “(a.) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value,” etc.
 

 The fact is that the cotton belonged to plaintiff and was to be held and not sold except under instructions from plaintiff, which in fact were not given or received.
 

 The fact is that no authority was conferred by plaintiff upon W. B. Thompson & Co. to store the cotton in a public warehouse and secure negotiable warehouse. receipts therefor.
 

 It is clear, therefore, that the warehouse receipts in this ease were not validly nego
 
 *259
 
 tiated to the banks by W. B. Thompson & Co.
 

 As said by Mr. Justice Hughes in Commercial National Bank v. Canal-Louisiana Bank & Trust Company, 239 U. S. 520, 36 S. Ct. 194, 195, 60 L. Ed. 417, Ann. Cas. 1917E, 25: “It is a familiar rule that one who has no title to chattels cannot transfer title unless he has the owner’s authority or the owner is estopped. See Civil Code (La.) arts. 2452, 3142, 3145, 3146. It follows that, in the absence of circumstances creating an estoppel, one without title cannot transfer it by the simple device of warehousing the goods and indorsing the receipts. But if the owner of the goods has permitted another to be clothed with the apparent ownership through the possession of warehouse receipts, negotiable in form, there is abundant ground for protecting a bona fide purchaser for value to whom 'the receipts have been negotiated.”
 

 W. B. Thompson & Co. could transfer no title to the cotton for the reason that, while having possession, it had no title in the cotton itself, and no capacity, authority, or ability to convey title to the cotton, within the purview of section 41 of the Warehouse Receipts Act, or otherwise.
 

 Years ago the Legislature enacted statutes upon the subject of negotiable warehouse receipts and bills of lading, far broader and far more reaching than the present Warehouse Receipt Act (Act No. 221 of 1908), and with the definite object of putting these instruments on a parity with negotiable bills and notes.
 

 These statutes provided in clear and explicit terms that warehouse receipts and bills of lading were to be thereafter negotiable “in the same manner and to the same extent as negotiable promissory notes and bills of exchange,” yet the Supreme Court of this state and the Supreme Court of the United States have uniformly held, notwithstanding the clear, unequivocal, and positive language of the statutes, that the bills of lading and warehouse receipts of a principal could not be validly pledged by a factor for the latter’s debt any more than they could have been under the codal law prior to the enactment of this special legislation. Act No. 150 of 1868; Act No. 72 of 1876; Act No. 156 of 1888, p. 216. Lallande v. His Creditors, 42 La. Ann. 710, 7 So. 895; Mechanics’ & T. Insurance Co. v. Iviger, 103 U. S. 355, 26 L. Ed. 433; Holton & Winn v. Hubbard & Co., 49 La. Ann. 715, 22 So. 338.
 

 Commenting on this situation, Mr. Denis has this to say: “The State of Louisiana has retained the rule of the common law, that the factor cannot validly pledge the property of its principal without the latter’s consent to secure the factor’s debt. The jurisprudence of that state has carried the practice to this extreme limiting notwithstanding the efforts o’f the Legislature to change it.” Denis on Contracts of Pledge, p. 441.
 

 2. Plaintiff also charges that the pledge is invalid because the banks were charged with notice and put upon inquiry of •the fact that the cotton and the warehouse receipts therefor did not belong to W. B. Thompson & Co., but to plaintiff or one of the customers of that firm.
 

 This ground of attack upon the validity of the pledge to the banks is based upon section 47 of the present Warehouse Receipt
 

 
 *261
 
 Act, Act No. 221 of 1908, which reads as follows :
 

 “Section
 
 4T.
 
 — When
 
 Negotiation not Impaired ly Fraud, Mistake, or Duress.
 
 — The Validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was induced by fraud, mistake, or duress to entrust the possessión or custody of the receipt to such person, if the person to whom the receipt was negotiated, or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, or fraud, mistake, or duress.”
 

 Section 56 of the Negotiable Instruments Law, Act No. 64 of 1904, provides that: “To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.”
 

 The plain difference between the Warehouse Receipt Act and the Negotiable Instruments Law is that the person, to whom a warehouse receipt is negotiated, takes no title thereto if he had notice of a breach of duty or trust on the part of the person negotiating the receipt to him; actual knowledge of such breach of duty or trust not being necessary on the part of the person to whom it is negotiated, as is the case in the negotiation of negotiable instruments.
 

 Notice, in its accepted legal sense, means such information on the part of the person charged with notice as would put a prudent person on inquiry to ascertain the true or actual facts.
 

 In our opinion, defendant banks had notice of the breach of duty or trust on the part of W. B. Thompson & Co. when' they accepted in pledge from that firm the warehouse receipts in question in this case.
 

 The business of W. B. Thompson & Co. was that of factor and commission merchant exclusively, and was publicly known as such. The firm handled very little cotton on its own account, and- owned and had bought only 109 bales of cotton during the period running from 1923 to 1928 — 55 bales in 1923, 2 bales in 1925, and 52 bales in 1926. These facts were disclosed by the books and records produced by W. B. Thompson & Co. in open court.
 

 Annually, if not more often, the firm furnished defendant banks with reports and statements of its business and condition. These were transmitted to the credit departments of the banks for examination, analysis, and report. Necessarily, the banks were fully informed of the affairs and business of W. B. Thompson & Co.
 

 In March of each year, from 1921 to 1928, inclusive, W. B. Thompson & Co. submitted to defendant banks a statement containing a trial balance from its books. On these statements are listed the assets and liabilities of the firm, containing such items as “cash,” “stocks,” “real estate,” bills receivable,” and “open accounts”; but on not one of these statements is there listed a single bale of cotton owned by W. B. Thompson & Co., with the sole exception of the -balance .sheet of the year 1924, which lists 55 bales as belonging to the firm.
 

 
 *263
 
 ■ It is obvious that these balance sheets furnished defendant banks with positive information that the business conducted by W. B. Thompson & Co. was exclusively that of factor and commission merchant, that it handled no cotton of its own, and that all the warehouse receipts pledged to defendant banks covered cotton belonging to customers of that firm.
 

 Of this there can be no doubt, since the balance sheet of 1924 shows only 55 bales owned by W. B. Thompson & Co. and $675,009 worth of cotton belonging to its customers.
 

 The balance sheet of 1925 shows no cotton owned by the firm, but 1,500 bales held by it and belonging to its customers.
 

 ' The balance sheet of 1926 shows no cotton belonging to the firm, but 10,067 bales, valued at $S77,000, belonging to its customers.
 

 The balance sheet of 1927 shows no cotton owned by W. B. Thompson & Co., but 7,2S5 bales belonging to its customers and valued at $500,000.
 

 The balance sheet of 1928 lists no cotton belonging to W. B. Thompson & Co., but there is listed thereon “Stock of 2852 B/C Customers Cotton On Hand.”
 

 The financial condition of W. B. Thompson & Co. had become acute in March, 1927, and the president of the Canal Bank & Trust Company required that an audit of the books ,of the firm be made by a public accountant.
 

 Page 1 of the trial balance sheet of this audit disclosed a further shrinkage in net worth of $120,000, as compared with the trial balance W. B. Thompson
 
 &
 
 Co. had furnished defendant banks in March, 1927. It also showed that the bills payable ¿nd other liabilities of the firm had mounted from $648,405.84 in March, 1927, to $721,620.03 in May of the same year; and that, though W. B. Thompson & Co. owned no cotton of its own, and had on hand only cotton belonging to its customers, it had pledged to defendant banks for its own loans of nearly $438,000 practically all of its customers’ cotton, of a value aggregating $365,000, when in fact the advances made by Thompson & Co. to these planters amounted to only $214,462.-30; and the advances made by the firm to plaintiff amounted to only $12,601.20 on 681 bales of cotton owned by him and valued at $90 per bale.
 

 On pages 28 and 29 of the audit we find included in the pledge to defendant banks $50,-000 worth of cotton belonging to planters who owed the firm nothing, and whose cotton the firm had not the remotest right to pledge.
 

 Under this state of facts, we are of the opinion that defendant banks had notice, if not actual knowledge, that the business of W. B. Thompson & Co. was exclusively that of factor and commission merchant, that this firm did not own the cotton it pledged to defendant banks, and that such pledges were a breach of duty and trust on the part of the firm to plaintiff and its other customers.
 

 Under these conditions, defendant banks did not acquire title to the warehouse receipts or the cotton of plaintiff by virtue of the acts of pledge executed by
 
 W.
 
 B. Thompson & Co. to defendant banks.
 

 Judgment affirmed.