No. 12,158.

HOLTON & WINN VS. JOHN A. HUBBARD & CO. ET ALS.

The owner who ships under a bill of lading and hands the bill to his factor may
be said to have more or less connection with that instrument when it is sub-
sequently advanced by a third party as the basis of rights predicated by him
upon possession of the bill by the factor, particularly if the delivery of the
property is directed to be made to the factor or his order.  If after the cotton
has been received and the bill of lading therefor has fully carried out its pur-
pose of delivery, the factor stores the cotton, takes a receipt for the same in
his own name from the warehouse and makes use of the receipts as a basis for
credit, the warehouse receipts evidence a contract with which the owner is

disconnected; it is an original transaction between the factor in his own name and the proprietors of the warehouse to which the owner is not "a party" though he has an interest in the subject matter. It is clear that any contract by which one person attempts to divest another of his property, without the owner's consent, express or implied, or through due process of law, is without force. C. C., Art. 1889. The doctrine which prevails in France that the possession and title of movable property go together (C. N., Art. 2279) has never prevailed in this State, and it certainly was not the intention of the lawmaker in enacting Act No. 156 of 1888 to introduce it now. It was never contemplated by the lawmaker that the mere fact that a factor should be the holder of a warehouse receipt, taken out by himself in his own name, should confer upon parties the right to deal with a factor, and to absolutely ignore, under full protection, the relations which he has to the property and to its owner.

Where the payee of a note after having discounted it in bank *under his endorsement,* takes it up on the first day of grace, the effect of the payment is to replace in the endorser the title to the note which had passed to the bank under the endorsement and enable him to reissue the note as a collateral as far as third persons are concerned as if it had been transferred by him to them for the first time. A note is not overdue as to the equities until the days of grace have expired and the equities (in the absence of special circumstances) are cut off until then.

#### ON APPLICATION FOR A REHEARING.

In this case there was no entrusting by the owner of the factor with the *indicia* of title.

From an early period the courts of this State have enforced the principle that the factor could not, for his own debts, pledge the property of his principal, and that such pledge was no impediment to a recovery by the owner.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

___

*James B. Guthrie* for Plaintiff, Appellant:

There arises out of the relation of principal and factor an absolute incapacity on the part of the factor to pledge for his own debts (whatever the form in which the pledge is attempted to be made) property consigned to him for sale, unless especially authorized so to do by his principal.

Though a factor may sell and bind his principal, he can not pledge the goods as a security for his own debt, even though there had been warehouse receipts, under Act 156 of 1888, issued to him therefor. Civil Code, Arts. 3142, 3145, 3146, 3158; Hadwin vs. Fisk, 1 An. 74; Avery vs. Gurney, 17 La. 166; Bonnoit vs. De Fuentes, 10 An. 72; Miller vs. Schneider, 19 An. 306; Young vs. Scott, 25 An. 313; Stern Bros. vs. Bank, 34 An. 1121; Lalande vs. His Creditors, 42 An. 705; Allen vs. Bank, 120 U. S. 33.

Act 156 of 1888 does not repeal any portion of Act 72 of 1876, nor
    any provision of the Civil Code governing the right of pledge,
    nor does it alter the settled jurisprudence of this State on the
    doctrine that a factor can not pledge for his own debt property
    consigned to him.    This statute of 1888 is an act in *pari materia*
    with Act 72 of 1876, and with Act 150 of 1868, and with Art.
    3158 of the Civil Code, and all of these acts must be construed
    with reference to each other.    Bond vs. Hiestand, 20 An. 140;
    Sutherland on Statutory Constructions, Secs. 283, 284, 287
    288, 321 and 322; McCools vs. Smith, 1 Black U. S. R. 470;
    Potter's Dwarris, pp. 154 and 156, notes 54 and 55.

The Act of 1888 shows no purpose of legalizing pledges by factors
    reprobated by the general law, and by well accepted rules for
    construction this act of 1888 can not be deemed to affirm a fact-
    or's pledge as against the owner of the property.

The right of the owner to recover his property where a wrongful
    pledge has been made by the factor, specially reserved to the
    owner by section five (5) of Act 72 of 1876, has not been taken
    away from the owner by Act 156 of 1888.

G. L. Hall, for Plaintiff, submitted a brief.

W. S. Parkerson, amicus curiæ, submitted a brief on the same side.

E. T. Merrick joined in a brief filed by J. B. Guthrie, asking an
amendment of the decree.

Sam'l L. Gilmore, for Hibernia National Bank, Appellee; Thos. J.
Semmes, of Counsel:

Public warehouse receipts, issued under and in conformity with Act
    156 of 1888, are negotiable and transferable by endorsement in
    blank or by special endorsement and delivery, in the same man-
    ner and to the same extent as promissory notes now are, with-
    out other formality, and the transferee or holder of such public
    warehouse receipt shall be considered and treated as the actual
    and exclusive owner, to all intents and purposes, of the property
    therein described, subject only to the vendor's lien on agricult-
    ural products, and the lien and privilege of the public ware-
    houseman for storage and other warehouse charges.    Act 156 of
    1888; Act 63 of 1890.

Act No. 56 of 1888 is a recognition of the equitable principle that where one of two innocent persons is to suffer a loss, the loss should be borne by the one who, by his conduct, has made the loss possible, and of the commercial necessity for the quick, easy and safe transfer of merchandise. Lickbarrow vs. Mason, 2 Dunforth and East Reports, pages 72 and 76; 1 H. Blackstone's Reports, page 358; 6 East Reports, pages 20, 34, 35 and 36; Benjamin on Sales, pages 922, 924, 925, 926, 928 and 929; Tiedman vs. Knox, 53 Maryland, 614.

The pledges made to defendant in this case are in due form of law and valid under Act 156 of 1888. Articles 3158, 3159, Civil Code; DeBlois vs. Reiss, 32 An. 588; Auger vs. Vanal, 31 An. 867; Martin vs. His Creditors, 15 An. 165.

The warehouse receipts in this case, purported to be such, specified on their faces the dates of their issuance, the name and location of the warehouse, and the quantity, number and marks of the property stored, and the dates on which the rice was originally stored in warehouse.

The pledges made to defendant in this case are valid under the Act 72 of 1876, the pledgor having, at the date of the pledges, an interest in the merchandise pledged, exceeding the value of the merchandise at the dates of the pledges.

The plaintiffs have affirmed the validity of the pledges made by their factor with the defendant. Pitts vs. Schubert, 11 La. 288; Bonner vs. Poydras, 2 Rob. 20; Wennecker vs. Marchand, 18 La. 147; Bloodworth vs. Jacobs, 2 An. 29; Dunbar vs. Bullard, 2 An. 821.

Where two persons sue for the recovery of property in which they have a joint interest, the defendant may institute against them, individually, a demand in reconvention. Halliman vs. Clark, 4 An. 197; Code of Practice, 375.

Where there is ground for exception to a demand in reconvention, and the plaintiff goes to trial on the merits of the reconventional demand without objection and introduces evidence thereon, the exception is waived. Irwin vs. Bank of Kentucky, 5 An. 3; Arrowsmith vs. Durel, 14 An. 850.

Members of a planting partnership are ordinarily bound, jointly, for partnership debts, but they may stipulate for a solidary obligation by special contract. Payne vs. James & Trager, 36 An. 476.

The extension or renewal of a note at its maturity, by substituting a
new note with interest, paid in advance, in the ordinary manner
of banks, does not operate novation or extinguish the original
obligation.   Union National Bank vs. Slocomb, 34 An. 927;
Rozenda vs. Zabriske, 4 Robinson, 497.

Payment of a promissory note by an endorser who has an interest
does not extinguish the note as to the maker.   Lanata vs.
Bayhi, 31 An. 229; Saul vs. Nicolet's Executors, 15 La. 246;
Millaudon vs. Colla, 15 La. 213; Wiggins vs. Flower, 5 Rob. 406

Argued and submitted December 2, 1896.
Opinion handed down February 1, 1897.
Rehearing refused April 12, 1897.

### STATEMENT OF FACTS.

Holton & Winn is a planting partnership, domiciled in Calcasieu
parish.

J. A. Hubbard was a well-known commission merchant, residing
and doing business in New Orleans, in 1893, where he had been thus
engaged since 1888, and the bank had known Hubbard as a com-
mission merchant for three or four years.

Holton & Winn consigned to J. A. Hubbard, between the 1st and
9th of December, 1893, a lot of rough rice amounting to one thousand
two hundred and fifty-six sacks, which Hubbard received and sold
on its arrival (about December 12, 1893), for a net sum, after de-
ducting freight money and commissions, of three thousand six hun-
dred and eighty-two dollars and fifty-one cents.

Holton & Winn subsequently consigned to J. A. Hubbard a lot of
rough rice, to-wit: the one thousand nine hundred and sixty-nine
sacks involved in this suit.

Said lot of rice was duly received by J. A. Hubbard between
the 20th and 31st of December, 1893, and stored by Hubbard in the
Rio Warehouse of John Holmes & Co. (public warehousemen under
Act 156 of 1888).

Said rice came to New Orleans in ten cars, each car bearing a
number.

Early in February, 1894, J. A. Hubbard & Co. and the individual
members of said firm surrendered in insolvency.

Holton & Winn, finding their nineteen hundred and sixty-nine sacks of rice in said warehouse unsold, brought this action to recover same as owners, sequestered the same, and also sequestered the ten receipts issued by the Rio Warehouse above referred to, which ten receipts were found in the possession of the Hibernia National Bank, claiming to hold them by virtue of a pledge made by John A. Hubbard to the said bank as security for the debt of Hubbard to the bank.

The syndic of J. A. Hubbard was made party.

John Holmes & Co. were also made defendants, but the action against that firm was discontinued.

The Hibernia National Bank bonded the nineteen hundred and sixty-nine sacks of rice, and also bonded the said ten receipts of the Rio Warehouse.

Under an agreement of counsel for plaintiffs and the bank, the rice was sold on the 19th of April, 1894, and the proceeds, amounting to eight thousand one hundred and fifteen dollars and fifty cents, after paying all charges, retained by the bank in place of the said rice sequestered by plaintiff, and subsequently bonded by the bank.

The syndic answered, admitting the shipment of rice by plaintiff to Hubbard, as claimed in the petition of plaintiff, and submitted the matter to the court.

The only parties before the court are Holton & Winn, plaintiffs and appellants, and the Hibernia National Bank, appellee, defendant in the original suit, and plaintiff in a reconventional demand set up in the original answer, claiming judgment against the firm of Holton & Winn, as " the holders and owners" of the individual note of W. L. Holton and T. H. Winn, dated March 1, 1893, drawn for five thousand dollars to order of J. A. Hubbard.

The bank in its answer set up that the warehouse receipts were in due form and held by the bank under legal and valid pledge, and claimed the right to sell the rice and appropriate the proceeds toward the payment of the amount due them by J. A. Hubbard.

In a supplemental answer the bank avers that the plaintiffs, Holton & Winn, had furnished Hubbard with the note so that he might discount it with some bank, the agreement being that he would advance them, for their planting operations, the amount of the note, less the discount, he to be reimbursed out of the proceeds of rice which was to be shipped to him.

The Hibernia National Bank, with which Hubbard had had business transactions for several years, and where he was known to the president, with whom the business was arranged, as a general rice merchant, commission merchant and purchaser of rice, discounted the paper.

At the maturity of this note of March 1, 1893, Holton & Winn, not being able to pay the note, requested Hubbard to secure an extension or renewal of the note, and with that end in view, furnished to Hubbard a note dated December 16, 1893, for five thousand dollars, signed "Holton & Winn." This second note was signed in the city of New Orleans, by Mr. Winn, one of the partners.

These ten receipts were issued to John A. Hubbard, and cover the one thousand nine hundred and sixty-nine sacks of rice described in the petition.

These identical one thousand nine hundred and sixty-nine sacks of rice were sequestered by plaintiffs in the Rio Warehouse and these identical ten warehouse receipts were sequestered in the hands of the Hibernia National Bank, same being endorsed by John A. Hubbard, when thus sequestered.

Under an agreement between counsel, the said one thousand nine hundred and sixty-nine sacks of rice were sold and netted, over and above the storage charges and the brokerage paid out of the funds, the sum of eight thousand one hundred and fifteen dollars and fifty cents, which money the bank received not later than May 4, 1894, and that said fund stands in lieu and place of the said rice (R., Agreement, 207; R., Dupre, 34, 35, 36, 37; Certificate of Dupre, 208).

When Hubbard attempted on December 18 and 29, 1893, to effect a pledge of this rice to the Hibernia Bank for his own debts, Holton & Winn were not indebted to Hubbard.

On the 1st of March, 1893, John A. Hubbard offered to the Hibernia National Bank, for discount, a note for five thousand dollars, payable 15th of December, 1893, made by William L. Holton and T. H. Winn to the order of John A. Hubbard, and by him endorsed.

The bank agreed to grant the renewal, but required that the first note upon which Holton & Winn were liable, *in solido*, should remain in its hands as collateral to secure the payment of the second note, which was one at sixty days. This was agreed to, and according to the usual custom of banks in making renewals of paper, Hubbard

46

gave his check to the bank for five thousand dollars, the amount of the note of March 1, 1893, and the bank discounted the second note, passing the proceeds to Hubbard's credit, and also retained the first note under the agreement.

On the 18th of December, 1893, Hubbard applied to the bank for a loan of four thousand eight hundred dollars, offering as a collateral security eight hundred and fifty-three sacks of rice then in the Crescent Warehouse, and one thousand five hundred and thirty-eight sacks of rice then in the Rio Warehouse, represented by public warehouse receipts issued by these public warehouses, in his name and by him endorsed, in which quantity of rice only four hundred and nine sacks of the rice involved in this case were included. The bank made the loan, taking from Hubbard his note at ninety days, payable to the bank, dated December 18, 1893, for the sum of four thousand eight hundred dollars, and, according to its usual custom, required Hubbard to sign a contract of pledge reciting the number of sacks of rice pledged, the names of the warehouses in which it was stored and the date, amount, and the maturity of the note, taking at the same time from Hubbard the warehouse receipts for the rice described in the pledge.

On the 29th day of December, 1893, Hubbard again applied to the bank for a loan of eight thousand six hundred dollars, and made a second pledge of rice, four thousand three hundred and eighty two sacks then in the Rio Warehouse, represented by warehouse receipts in the same manner in which the pledge of 18th December, 1893, was made. In this pledge of 29th December, 1893, the balance of the rice involved in this suit, one thousand five hundred and sixty eight sacks of rice, was included.

The judgment of the District Court was against the plaintiffs and in favor of the Hibernia Bank, maintaining the validity of the pledge made by Hubbard to the bank through the medium of the ten warehouse receipts issued by the Rio Warehouse to Hubbard for the rice, giving the net proceeds of the sale of the rice to the bank and further giving judgment in favor of the Hibernia National Bank against Holton & Winn on their reconventional demand for five thousand dollars and interest.

Plaintiffs appealed.

The opinion of the court was delivered by

NICHOLLS, C. J.  The first question submitted to us for decision is as to the respective rights of the plaintiffs, Holton & Winn, and those of the defendant, the Hibernia National Bank, touching one thousand nine hundred and sixty-nine sacks of rice which were placed on storage in the Rio Warehouse in New Orleans by John A. Hubbard in his own name, and for which John Holmes & Co., the proprietors of the said warehouse, issued ten warehouse receipts.

The plaintiffs allege that the rice in question belongs to them, that they shipped it to John A. Hubbard for sale; that their ownership has never been divested by sale; that Hubbard was without authority to pledge it; that belonging to them, they are entitled to have their ownership recognized and to have the rice delivered to them, and they so pray.

The Hibernia National Bank contest plaintiffs' claims and set up their right to hold the rice; to sell it and to apply the proceeds of sale to the extinguishment of an indebtedness of Hubbard to them. They aver that they are the holders and owners under the endorsement of Hubbard of the ten warehouse receipts which John Holmes & Co. issued for the same; the said receipts having been pledged to them by Hubbard to secure payment of the said indebtedness. They maintain that whatever rights plaintiffs had in the rice originally must yield to those which have become vested in themselves as holders and owners of the receipts.  There is no question as to the fact that the rice belonged to the plaintiffs; that it was shipped by them to Hubbard as a factor for sale, and that it had not been sold. · It had been pledged through the warehouse receipts given for the same to the Hibernia National Bank to secure Hubbard's individual debt to them.  Plaintiffs, in addition to denying generally that Hubbard was authorized to pledge the rice, aver that at the time it was pledged by him to the bank they owed him nothing.

The bank contends that, independently of any question as to whether Holton & Winn were indebted to Hubbard at the time he pledged the receipts and cotton to them, they are protected as holders and owners of the receipts in good faith under Hubbard's endorsement from any adverse claims which could be urged.

The bank's claims are based upon the provisions of Act No. 156 of 1888.

That act is entitled: "An act to define and regulate the business

of public warehouses and the issue of warehouse receipts; to define and punish violations of this act, and to repeal conflicting laws."

We make from the act such extracts as bear upon this controversy.

The third section declares that on application of the owner or depositor of the property stored in a public warehouse, the warehouseman shall issue over his own signature and that of his duly authorized agent a public warehouse receipt therefor, to the order of the person entitled thereto, which receipt shall purport to be issued by a public warehouse, shall bear date of the day of its issue and shall state upon its face the name of the warehouse and its location; the description, quantity, number and marks of the property stored, and the date on which it was originally received in warehouse, and that it is deliverable upon the return of the receipt, properly endorsed by the person to whose order it was issued and upon payment of all charges for storage. All such receipts shall be numbered consecutively in the order of their issue, and no two receipts bearing the same number shall be issued from the same warehouse during the same year, nor shall any duplicate receipt be issued except in the case of a lost or destroyed receipt, in which case the new receipt shall bear the same date and number as the original, and shall be plainly marked on its face "Duplicate;" and provided that no such duplicate receipt shall be issued by any public warehouseman until adequate security be deposited with or to the order of said warehouseman to protect the party or parties who may formally hold the original receipt in good faith and for a valuable consideration.

The seventh section declares that the receipts issued against property stored in public warehouses, as herein provided for, shall be negotiable and transferable by endorsement in blank or by special endorsement and delivery in the same manner and to the same extent as bills of exchange now are, without other formality, and the transferee or holder of such warehouse receipt shall be considered and held as the actual and exclusive owner to all intents and purposes of the property therein described, subject only to the lien and privilege of the public warehouseman for storage or other warehouse charges; provided, however, all such public warehouse receipts as shall have the words "not negotiable" plainly written or stamped on the face thereof shall be exempt from the provisions of this section, and provided further that no public warehouseman shall issue

warehouse receipts against his own property in his own warehouse; but upon sale of such property in good faith, may issue to the purchaser his public warehouse receipt in form and manner as herein provided, which issue and delivery of the receipt shall be deemed to complete the sale and shall constitute the purchaser full owner as aforesaid of the property therein described. Nothing in this last clause shall be construed to exempt the issuer of said receipt for his own goods in his own public warehouse from complying with and being subject in all respects to all the other sections and provisions of this act.

Section 8 declares that a public warehouseman who violates any of the provisions of this act shall be deemed guilty of a criminal offence and upon indictment and conviction thereof shall be fined at the discretion of the court in any sum not exceeding five thousand dollars or imprisoned in the State penitentiary not exceeding five years, or both.

Section 9 declares that nothing in this act shall be construed to apply to private warehouses or to the issue of receipts of their owners or managers under existing laws, or to prohibit public warehousemen from issuing such receipts as are now issued by private warehousemen under existing laws, provided that such private receipts issued by public warehousemen shall never be written on a form or blank indicating that it issued from a public warehouse, but shall, on the contrary, bear on its face, in large characters, the words "Not a public warehouse receipt," in addition to any form of words imposed by laws heretofore in force.

The tenth section declares that all laws or parts of laws in conflict with this act were thereby repealed in so far as they conflicted.

At the time this act was passed there stood upon the statute books a statute bearing upon the subject of cotton press receipts and warehouse receipts, which was approved March 11, 1876, and known as Act No. 72 of that year. The title of the act was: "An act governing the manner in which cotton press receipts, warehouse receipts, or the receipts of other custodians of any property whatever, shall be issued in all cases where such receipts shall or may be used or pledged as collateral security for money advanced or borrowed on faith of the property therein specified, and governing the delivery and disposal of the property for which such receipts may be issued."

The fourth, fifth and eighth sections of that act are as follows:

Holton & Winn vs. Hubbard & Co. et als.

" Sec. 4. Parties who may borrow money on the faith of warehouse receipts, representing property in store, shall file their affidavit with the pledgee that such property is theirs, the pledgor's personal property, or that it is the property of some party for whom the pledgor is acting as agent, factor, commission merchant, or in any other fiduciary capacity, and that said party is justly and truly indebted to the pledgor in an amount equal to the value of the property pledged as specified in the warehouse receipt for moneys paid to him or paid by his order and for his account by the party or consignee making the pledge. The cashier of a bank or the secretary of an insurance company, incorporated or working under any law in the United States, or of this State, is hereby authorized to administer the oath contemplated under the provision of this act. Any deviation therefrom shall render the party so deviating liable for the value of the property or any excess in value over and above the amount for which it may be pledged in any manner specified in Sec. 1 of this act, and to prosecution for perjury and also for obtaining money under false pretences.

" Sec. 5. The vendor's lien of five days privilege now allowed in commercial transactions for the payment of the purchase price shall not be affected by the provisions of this act except in case in which a warehouse receipt has been pledged as collateral for money borrowed. The holder of the warehouse receipt shall be considered and held as the actual owner of the property described in the receipt, and no clause of this act shall operate to the detriment or injury of a warehouse receipt to the extent of the value of the property specified, made and issued in accordance with and under the provisions of this act; provided, that where the factor, agent or pledgor may have wrongfully pledged in violation of this act any property, the lien of the owner shall be valid even against the third holder of the warehouse receipt.

" Sec. 8. All warehouse receipts, as by this act provided, shall be negotiable by endorsement in blank or by special endorsement in the same manner and to the same extent as bills of exchange and promissory notes now are."

This act (Act 72 of 1876) had been preceded by Act, No. 150 of 1868, entitled an "Act to prevent the issue of false receipts or bills of lading and to punish fraudulent transfers of property by cotton press, wharfingers and others," from which we copy.

" Sec. 2. No cotton press, wharfinger or other person shall sell or encumber, ship, transfer or in any manner remove or permit to be shipped, transferred or removed beyond his control any goods, wares, merchandise, grain, flour or other produce or commodity for which a receipt shall have been given by him as aforesaid, whether received for storage, shipping, grinding, manufacturing or other purpose, without the written assent of the person or persons holding such receipt.

" Sec. 6. Cotton press receipts given for any goods, wares, merchandise, grain, flour or other produce or commodity, stored or deposited with any cotton press, wharfinger or other person, or any bill of lading given by any forwarding boat, vessel, railroad, transportation or transfer company, may be transferred by transfer thereon, and any person to whom the same be transferred by delivery shall be deemed and taken to be the owner of the goods, wares, merchandise, grain, flour or other produce or commodity therein specified, so far as to give validity to any pledge, lien or transfer made or accepted by such person, but no property shall be delivered except on surrender and cancellation of said original receipt or bill of lading on the endorsement of such delivery thereon; in case of partial delivery all cotton press receipts or bills of lading, however, shall have the words, " not negotiable " plainly written or stamped on the face thereof and shall be exempt from the provisions of this act.

" Sec. 8. All the provisions of this act shall apply and be applicable to bills of lading and to all persons or corporations, their agents or servants, that shall or may issue bills of lading of any kind or description, the same as if the words ' forwarded and bills of lading ' were mentioned in every section of this act.

" Sec. 9. All receipts, bills of lading, vouchers or other documents issued by any cotton press, wharfinger, forwarder, or other person, boat, vessel, railroad, transportation or transfer company, as by this act provided, shall be negotiable by endorsement in blank or by special endorsement, in the same manner and to the same extent as bills of exchange or promissory notes now are.

" Sec. 12. If any commission merchant, agent or other person storing or shipping any goods, wares, merchandise, grain, flour or other produce or commodity in his own name, being in the possession thereof, for or on account of another person, and negotiating,

pledging or hypothecating the cotton press receipt or bill of lading received therefor and not accounting or paying over to his principal or owner of the property the amount so received on such negotiation, pledge or hypothecation, shall be adjudged guilty of fraud, and upon indictment and conviction thereof shall be fined in a sum not exceeding five thousand dollars, or imprisoned in the penitentiary in this State for a term not exceeding five years, or both."

By the second section of an act entitled "An act relative to pledges," approved March 15, 1855, pledges of movable property could be made by private writing accompanied by actual delivery, and "the delivery of property" on deposit in a warehouse passed by the private assignment of the warehouse receipt so as to authorize the owner to pledge such property. The pledge so made, without further formalities, was valid, as well against third persons as against the pledgors, if made in good faith.

In addition to the statutes which we have quoted having reference to "cotton press and warehouse receipts," there are others bearing upon the special subject of "Bills of Lading" and the effect thereof, which we should read in connection with Arts. 3145, 3146, 3152 and 3158 of the Revised Civil Code, and with Art. 3214 of the Code of 1825, as amended by the act of 1841; in other words, with Art. 3247 of the present Code.

Article 3214 of the Code of 1825 gave to every consignee or commission merchant, who had made advances on goods consigned to him or placed in his hands to be sold for account of the consignor, a privilege for the amount of these advances, with interest and charges on the value of the goods, if they are at his disposal in his stores or in a public warehouse, or if before their arrival, he could show by a bill of lading or letter of advice that they had been dispatched to him, the privilege extending to the unpaid price of the goods which the consignee or agent shall have thus received and sold.

In 1841 the article was amended so that every consignee, commission merchant or factor should have a privilege preferred to any attaching creditor on the goods consigned to him for any balance due him, whether specially advanced on said goods or not, provided they have been received by him, or an invoice or bill of lading had been received by him previous to the attachment.

In 1874 an act was passed by the General Assembly entitled "An

act to enable planters, farmers, merchants, traders and others to pledge and pawn sugar and other agricultural products to merchants, factors and others, and to confer a pledge by the transmission of the bill of lading or carrier's receipt by mail or by the carrier."

By the first section it was enacted that in addition to the privilege now conferred by law any planter or farmer might pledge or pawn his growing crop of cotton, sugar or other agriculturul products for advances in money, goods and necessary supplies that he might require for the production of the same, by entering into a written agreement to pledge the same and having the agreement recorded in the office of the recorder of mortgages of the parish where said cotton, sugar or other agricultural product is produced, which recorded contract should give and confer on the merchant or other person advancing money, goods and necessary supplies for the pro- duction of the said agricultural product, a right of pledge upon said crop the same as if the said crop had been in the possession of the pledgee, provided that the right of pledge, thus conferred, shall be subordinate to that of the claim of the laborers for wages and for the rent of the land on which the crop was produced.

Sec. 2. When any merchant, factor, or other person has advanced money, property or supplies on cotton, sugar or other agricultural products, and the same has been consigned to him by ship, steam- boat, vessel, railroad or other carrier, the said agricultural products shall be pledged to the consignee thereof from the time the bill of lading thereof shall be put in the mail, or put into the possession of the carrier for transmission to the consignee, and the right of pledge shall be perfect, with the right of sale of said property, which shall be fully vested in said consignee with the right to appropriate the proceeds of sale to the payment of the amount due for such ad- vances as may have been made thereon; provided, that nothing shall be so construed as to defeat or lessen the privileges of the laborers and landlords in this State for wages and rent as now existing by law.

Sec. 3. All merchants, factors and others who may have a general balance of account, or any sum of money due them by any consignee (consignor?) or other person sending them cotton, sugar or other agricultural products for sale at the port of New Orleans, or any other town or city in the State, shall have a pledge upon all such property consigned or sent to them by ship, vessel, railroad or other

carrier from the time the bill of lading or receipt therefor by the carrier is deposited in the mail or given to the carrier for tramsmission, which pledge shall be perfect with the right of sale of said property, which shall be fully vested in said consignee with the right to appropriate the proceeds of sale to the payment of the amount due such consignee; provided, that nothing herein shall be so construed as to defeat or lessen the privilege of the laborers and landlords in this State for wages and rent as now existing by law.

A comparison of the provisions of this statute with the law then in force shows that it was intended to modify, in favor of the parties in whose interest it was enacted, the existing laws upon the subject of pawn, and to some extent the laws upon the subject of sale. It will be seen that the right of pawn granted was made to cover a growing crop, and that under the law the contract of pawn became perfect and complete and the rights of a pledgee fully vested under circumstances and conditions different from those which would have been necessary prior to the passage of the act. The consignee, commission merchant or factor, who under Art. 3247, up to that time was secured as to payment only by a "privilege," became secured additionally by a "statutory pledge" dispensing with actual delivery, and the bill of lading referred to in that article had its functions widened and extended beyoud those which were announced in the article of the Code cited. Merchants and factors occupying the position provided for in the statute, acquired, in addition to a right of pledge, a "right of sale" with "the right of appropriating the proceeds thereof."

The rights and obligations of different parties as holders of "bills of lading" have been made the subject of special legislation at different times, as the statutes which we have cited of 1874, 1876 and 1888 will show.

These rights and obligations, and those resulting from warehouse or cotton press receipts, though alike in some respects, differ materially in others.

In Lallande vs. His Creditors, 42 An. 705, we were called on to pass upon the conflicting rights of the owner of certain cotton which he had shipped to his factor under a "bill of lading," and the Whitney Bank, which had made a loan to the factor, secured by a pledge of the "bills of lading," which had been forwarded to the merchant with the consignment of cotton.

Holton & Winn vs. Hubbard & Co. et als.

For the reasons assigned, we were of the opinion in that case that the rights of the original owner were not affected by the pledge. He owed his factor nothing at the time of the pledge, and we were of the opinion that the authority of the factor extended no further than selling the cotton, and that the pledge made by him was without effect. The rights of the parties, in that case, were determined upon statutes prior to Act No. 156 of 1888.

We think the claims of the Whitney Bank, rejected as claimants under a "bill of lading," were much stronger than they would have been had the bank claimed under a " warehouse receipt" originating with Lallande as a storer of the cotton. The owner who ships under a bill of lading and hands the bill to his factor may be said to have more or less connection with that instrument when it is subsequently advanced by a third party as a basis of rights predicated by him upon possession of the bill by the factor, particularly if the delivery of the property is directed to be made to the factor or his order. If after the cotton has been received and the bill of lading therefor has fully carried out its purpose of delivery, the factor stores the cotton, takes a receipt for the same in his own name from the warehouse and makes use of the receipt as a basis for credit, the warehouse receipt evidences a transaction with which the owner is disconnected. It is an original transaction between the factor in his own name and the proprietors of the warehouse to which the owner is not "a party" though he have an interest in the subject matter. "No' one (says Art. 1889 of the Civil Code) can, by a contract in his own name, bind any one but himself or his representatives, and it is clear that any contract by which one person attempts to divest another of his property without the owner's consent, express or implied, or through due process of law is without force. In France, under Art. 2279 of the Code Napoleon, the possession and title of movable property go together (" Possession vaut titre"). That doctrine has never prevailed here in the past and it certainly was not the intention of the lawmaker in enacting Act No. 156 of 1888 to introduce it now. Counsel's argument leads up directly to that result if the general public be authorized to contract with respect to property covered by warehouse receipts with holders of such receipts, and to be thoroughly protected (if not in bad faith) in their contracts upon a presumption *juris et de jure* that the holders of the receipts are owners of the property, or if not, that they have all the absolute powers

of owners over it. If a factor, authorized in point of fact to sell or to pledge the property of his principal, makes use of a warehouse receipt in order to vest rights in the pledgee or purchaser with whom he contracts, it may well be that the receipt may carry the property or the possession of the property as against the attaching creditors of the owner, or as against parties claiming rights under other contracts made by the factor in regard to the same property (C. C. 1922, 1923); but it was never contemplated, we think, by the lawmaker that the mere fact that a factor should be the holder of a warehouse receipt taken out by himself in his own name, should confer upon parties the right to deal with a factor, and to absolutely ignore, under full protection, the relations which he bears to the property and to its owner.

We can not for an instant believe that the General Assembly would enact a law which would enable parties to perpetrate fraud. The rule has always been, and it is now, that one person can not pledge the property of another, unless it be with the express or implied consent of the owner (C. C. 3145), and that when tacit consent is depended on it must be inferred from circumstances so strong as to leave no doubt of the owner's intention (C. C. 3146). The law cites as illustrations of cases wherefrom consent may be inferred, the presence of the owner when the contract was made or the delivery of the object pledged by the owner himself to the pledgee. The articles of the Civil Code upon that subject have not been repealed. The mere fact of a transmittal of movable property by its owner to a factor for sale furnishes no reason to the public to suppose that the owner authorized the factor to pledge it, and particularly to pledge it for his own debt.

Defendants say that the plaintiff knew that the rice when received would be placed on storage. That may be true, but it by no means follows from that they knew it would be placed in a "public warehouse," or if placed in a public warehouse that the factor would take out "negotiable" warehouse receipts for the same.

The receipts upon which defendants declare read as follows:

"Negotiable warehouse receipts issued by John Holmes & Co., Public Warehouse Proprietors under Act 156 of 1888.

"OFFICE 128 TCHOUPITOULAS ST.
"No. 6931.                    NEW ORLEANS, Dec. 18, 1893.
"Received on storage from John A. Hubbard in the Rio Warehouse, deliverable only on return of this receipt properly endorsed.

"Mark.                                    ARTICLES.

"Car 18,144.          Two hundred and eight sacks rough rice.

                    " (Signed)      JOHN HOLMES & CO.,
                    " (Endorsed)    JOHN A. HUBBARD."

The receipts in this case do not read " deliverable to John A. Hubbard or order," but read " deliverable only on return of this receipt properly endorsed."

In Lallande vs. His Creditors, 42 An. 711, the court alluded to the fact that the " bill of lading " declared on in that case called for a delivery to " Lallande " and not to " Lallande or order."

The third section of Act No. 156 of 1888 directs that the receipt under that act should be "to the order of the person entitled thereto," and that it should state that the property covered by it was deliverable upon the return of the receipt properly endorsed by the party " to whose order " it was signed, and the seventh section declares . that receipts issued against property " as herein provided for," shall be negotiable, etc.

While we notice this phraseology of the receipts, the views we have expressed do away with the necessity of our commenting upon it.

Defendants contend, however, that granting that their first proposition was not true, yet the rights which they advance in this case are none the less fully sustained, because at the time that Hubbard pledged the rice to them, Holton & Winn were .indebted to him, and therefore, as a factor holding in his possession property of the principal consigned to him for sale, and to whom the principal was indebted, Hubbard had the legal authority and right to make the pledge he did. We need not examine into this question, nor determine what the rights and obligations of parties would be, if, in point of fact, plaintiffs were indebted to Hubbard at the time the pledge was made, for the reason we do not find, as a fact, that they were so indebted, but, on the contrary, that Hubbard was at that time indebted to them. Defendants finally claim that the plaintiffs have ratified Hubbard's pledge of the property, by accepting from him, in satisfaction of their claims against him, a transfer of certain stock of the Ivens Manufacturing Company. The record does not bear out that contention. The transfer mentioned was a desperate effort by the plaintiffs to obtain from Hubbard (then on the point of making a surrender of his property) some security for the payment to them of the balance then due them by him on account. The stock

was worthless, and it was never contemplated by any of the parties that plaintiffs should surrender any of their rights. As said by this court in Crossley & Sons vs. Louisiana Savings Bank, 38 An. 87: "Such a transaction would have implied insanity." (See also Zeigler vs. His Creditors, *ante*, p. 144. We now come to the reconventional demand set up by defendants. They sue as the holders and owners of a note dated 1st March, 1893. This note was discounted by the Hibernia National Bank under Hubbard's endorsement. It was shown to have been, in fact, a firm note, though not so appearing on its face. (Reynolds vs. Swain, 13 La. 194.) Hubbard, who was to make advances in 1893 to the plaintiffs, informed them that he could utilize their note for that purpose—in himself obtaining money by its discount. It was to assist him in so doing that the note was executed and delivered. It was negotiable in form and discounted by the bank, free from all equities between the original parties. When it was about to mature, Hubbard (the endorser) took it up by his check, drawn on the bank itself. Immediately thereafter, in conformity to a prior understanding between himself and the bank that this should be done, the note was left with the bank as collateral security to secure the payment of a new note executed by Holton & Winn, bearing date December 16, 1893, for the sum of five thousand dollars, payable sixty days after date to the order of John A. Hubbard, which the bank discounted. It is claimed by the plaintiffs that when Hubbard drew his check on the bank for the first note, and that check was by them paid, the note itself was paid and extinguished. That Hubbard being at that time their debtor, and not their creditor, his leaving the note with the bank as a collateral was simply leaving with them a useless piece of waste paper, as it represented no indebtedness due by them to Hubbard.

The trouble with that contention is that Hubbard, when he drew his check on the bank, was an endorser upon the note, and that when after the check was drawn the note was replaced with the bank as collateral, the first note was not yet overdue; that is to say, the days of grace had not yet expired. When Hubbard offered it *de novo* (this time as collateral instead of for discount) the bank was justified in accepting it as such, and took it free from the equities in the absence of special circumstances which would have cut them off. None such are shown. The effect of the payment by Hubbard, through his check, was to replace in him the title to the note, which

had passed to the bank by its discount, under his endorsement, and enabled him to reissue it, so far as third persons were concerned, as if it had been transferred by him to them for the first time.   Lanata vs. Bayhi, 31 An. 232;  Millaudon vs. Colla, 15 La. 213;  Saul vs. Nicolet's Executors, 15 La. 246;  Wiggins vs. Flower, 5 Rob. 406.

It is true that the fact that a transfer had been made at that late date might have been advanced as a circumstance calculated to throw doubt as to the good faith of a party accepting it, then either as owner or by way of security, had such an issue been made and supported, but *per se* it does not establish bad faith.

In Woods' Byle on Notes and Bills (8th edition), page 170; it is stated as a rule of the commercial law that a bill or note assigned in due time on the day of payment is to be considered as assigned before it is due, and Goodpastor vs. Voris, 8 Clarke (Pa.), 334, is cited in support of the position that a note is not overdue until the days of grace have expired.   In Pike vs. Smith, 11 Mass. 38, it was held that a note endorsed on the last day of grace was taken dishonored, the court citing Staples vs. Franklin Bank, 1 Met. 43; Whitwell vs. Bringham, 19 Pick. 117;  Ayer vs. Hutchins, 4 Mass. 370;  Sargent vs. Southgate, 5 Pick. 312;  Portland vs. Maine Bank, 11 Mass. 204.

The defence set up in Pike vs. Smith was usury.   We think the rule announced in Goodpastor vs. Voris is that generally accepted.

Hubbard having both notes in his possession, the bank had the right to accept the second note as the original obligation, with the first note as collateral, or the first note as the principal obligation and the second as collateral (Ingram vs. Richardson, 2 An. 842).

We think plaintiffs entitled to protection against the second note.

For the reasons herein assigned it is hereby ordered, adjudged and decreed that the judgment of the Civil District Court be annulled, avoided and reversed in so far as it rejects plaintiffs' demand and prayer to be decreed the owners of the nineteen hundred and sixty-nine sacks of rice referred to in plaintiffs' petition, or subordinates their rights of ownership to the same to any claims or demand upon the same; and

It is now ordered and decreed that the plaintiffs, Holton & Winn, be and they are hereby declared and recognized as the owners of the nineteen hundred and sixty-nine sacks of rice referred to in their petition, stored by John A. Hubbard in the Rio Warehouse,

in New Orleans, and that they be delivered to them free from any claim upon them by the Hibernia Bank, and that the claims, pretensions and demands of the Hibernia Bank in, to or upon said rice be and the same are hereby rejected.

It is further ordered, adjudged and decreed that the Hibernia Bank do have judgment against, and recover from the plaintiffs, William L. Holton and Thomas H. Winn, *in solido*, the sum of five thousand dollars, with interest at eight per cent. per annum from 15th December, 1893, until paid, but that no execution issue upon the judgment herein in their favor until the note executed by Holton & Winn, the 16th day of December, 1893, for the sum of five thousand dollars, with interest thereon at eight per cent. from maturity, payable sixty days after date to the order of John A. Hubbard and endorsed by him, which is referred to herein and was discounted by the Hibernia Bank under the endorsement of said Hubbard, be produced and surrendered, or until the plaintiffs are fully protected and held harmless against the future appearance of the same.

## ON APPLICATION FOR REHEARING.

MILLER, J.    The very elaborate and vigorous brief for the rehearing, as well as the importance of this case, has prompted a re-examination.

The proposition that the pledge by the factor for his debts of the property of the principal can be maintained, derives, it is claimed, support from the English factor's act and similar legislation of some of the other States.    Our own jurisprudence is distinctly to the contrary, nor do we think the contention for the intervenor is materially assisted by the factor's acts introduced into this discussion.    The English act, as we understand it, maintained the pledge by the party intrusted with the bill of lading or warehouse receipt, provided the pledgee had no notice from the documents or otherwise that the party "intrusted" was not the real owner.    We must presume "intrusted" in this act has the usual significance.    We can appreciate that if the owner intrusts an agent with his property or with the muniments of title creating all the *indicia* of ownership, the owner would be bound by the pledge as he would by any other disposition of his property by the agent, if the transferee was in good faith.    In this case there was no intrusting by the owner of the factor with the *indicia* of title; all the owner did was to ship the

rice to the factor for the purposes of sale, and might well be deemed to rely on that limitation the law imposes on the factor's power and of which all who deal with him are by law deemed to be apprised. In those cases where the English statutes apply, the courts of England have held that pledges by factors are not deprived of the protection of the statute, if there is no evidence of bad faith in the pledgee other than knowledge that the pledgor is a factor. That knowledge our law implies in pledges by factors is (see 2 Kent, Secs. 626, 627) repeated in every phase of adjudications presenting the question. The Supreme Court of the United States, in language guarded, it is true, because the question here was not determined, announce their dissent, or at least reluctance to accept the English interpretation, that taking the pledge from a party known to be factor, and to hold property as such is not in itself sufficient to show bad faith in the pledgee. Nor have the New York courts, in dealing with statutes on this subject, similar to the English statute with respect to pledges by factors, been able to maintain factor's pledges upon the English theory that knowledge of his relation or occupation was not enough to charge him with bad faith. Allen vs. St. Louis Bank, 120 U. S., p. 37. In none of the New York cases, as we understand them, of factors' pledges was there any other basis to avoid the pledge than the fact it was made by one known to be a factor and was of property of that kind held by him as a factor. See 6 Hill, p. 512, and others cited in 120 U. S., p. 34. We do not therefore perceive that the English statute applying to those "intrusted with warehouse receipts" has any tendency to support the pledge by the factor not intrusted by the owner with the warehouse receipt or other similar *indicia* of title, and whose only function is to sell. Nor in the cases where the English act applies, does the construction of bad faith in the factor accord with the general current of American authority.

The New York factor's act validates pledges by those holding warehouse receipts or bills of lading. That act entirely omitted that portion of the English act which saved the rights of the owner whenever the pledgee knew he was dealing with an agent. Yet under this New York statute their courts have held "it was impossible to hold that the Legislature intended to enable the factor to commit a fraud on his principal by pledging or obtaining advances on the property when the pledgee knew he was dealing with an agent.

47

The Missouri factor's act followed the English and the New York act in upholding pledges created on the faith of warehouse receipts or bills of lading endorsed to the holders. The only, or rather the marked difference between the acts was that under the New York act, the pledgee accepting on the faith of apparent ownership was protected, and in the Missouri statute, the protection was to the pledge accepted on the faith of the receipt or bill of lading, duly endorsed. This Missouri act, as the Supreme Court of the United States observed, was not addressed to factors, nor does factor occur in any part of our statutes on which the intervenors rely. The act, said the court, was intended to regulate the issue and pledge of warehouse receipts. It does not seem to us any basis exists to give that statute any effect to protect pledges by factor, greater than that conceded to the New York act by the courts of that State. The act was designed to furnish the method of utilizing produce in warehouse by providing for loans on warehouse receipts, with no special reference to factors. The pledge by one known to be a factor carries a significance by legal implication inconsistent with good faith in the pledgee. Hence the New York courts excluded factors' pledges from the protection of the act. To the extent deemed open to comment, the Supreme Court of the United States announced the same conclusion. This case in the Supreme Court of the United States arose under this Missouri act. The suit was on a note given to the St. Louis factor by his principal, and afterward transferred to the plaintiff bank. The defence was the note had been paid by cotton shipped by the maker to the factor, but instead of applying the shipments to the payment of the note, the factor pledged the cotton for his own debt to the bank. On the validity of this pledge the United States Circuit Court divided, and the question was certified to the Supreme Court of the United States. That court refused to enforce the pledge on the ground of non-compliance with the statutory conditions to create the pledge, but in the opinion occur expressions adverse to the protection claimed to be afforded by the Missouri statute to factor's pledges, and indicating the appreciation the protection was only to *bona fide* endorsers of the receipt. Allen vs. St. Louis Bank, 120 U. S. 32, 35, 37, 39. It does not seem to us that these factor's acts give material assistance to the intervenor's pretension, even if we were at liberty to follow the acts.

We have, however, a well defined jurisprudence on this subject.

From an early period our courts have enforced the principle that the factor could not for his own debts pledge the property of his principal, and that such pledge was no impediment to a recovery by the owner. Stetson, Avery & Co. vs. Gurney, 17 La. 164; Hadwin vs. Fisk, 1 An. 74; Bonniot vs. Fuentes, 10 An. 72; Miller vs. Schneider & Zuberbier, 19 An. 300; Young vs. Scott & Cage, 25 An. 313; Stern Bros. vs. Bank, 34 An. 1120; Lallande vs. His Creditors, 42 An. 705. Our jurisprudence is based as well on the theory of notice to the pledgee arising from the transaction, as on the broader ground that the factor, with power only to sell, can not pledge, and that no man can be deprived of his property without his consent. It is difficult to hold that a principle so well established and a jurisprudence so distinctly marked, has been completely overthrown by a statutory change hitherto unsuspected, and claimed to have begun more than a quarter of a century ago. It is required by the Constitution that the substantial object of every act shall find expression in the title. The acts relied on are entitled, one " to prevent the issue of false receipts or bills of lading and to punish the fraudulent issue of cotton press receipts. Act No. 150 of 1868; another to define and regulate the business of public warehouses, the issue of warehouse receipts; to punish violations of the act and to repeal conflicting laws. Act No. 156 of 1888; and yet another with less suggestiveness of the purpose now attributed to this legislation, " to give a lien for the price on agricultural products sold in chartered cities. Acts 1890, No. 63. Would any legislator or citizen dream that under such titles it was proposed to displace a limitation of universal recognition on the power of the factor; radically change the contract of principal and agent, and clothe the factor with the power to appropriate for his own uses his principal property by procuring the issue of a warehouse receipt and pledging the receipt. When the factor's pledge was attempted to be supported to the extent now claimed, under the act of 1868, the Supreme Court, discarding the interpretation sought, observed, that if any such purpose was ever designed, the act would fail on the constitutional objection to the title. It does seem to us that without disregarding the constitutional requirement, it would be impossible to sustain these acts for the purposes now claimed, even if we believed that such purpose had been in the legislative contemplation.

The act of 1868, in its various sections, in so far as it is materia

to this controversy, providing for the issue of cotton press receipts, enacted that the transferee shall be deemed to be the owner of the property so as to give validity to any pledge or transfer created by him. The act of 1888 mainly relied on, we presume, made the receipt of the warehouseman, negotiable, the same as promissory notes, the transferee to be deemed the owner to all intents and purposes of the property, subject only to the storage lien. The act of 1890 gave the lien to the vendor of agricultural products, with preference over all, including the holder of the warehouse receipt. The act of 1890 has, in our view, no sensible influence in this discussion. Of first impression, the acts of 1868 and 1888 seem designed to regulate the issue and pledge of warehouse receipts. Factors are not mentioned. The well defined relation of factor and principal does not seem to have been in the legislator's contemplation, least of all, the intention to disturb it. Can we graft on these acts the displacement of a fixed limitation on his power and the substitution of his right to convert to his own use his principal's property by the simple expedient it is supposed this statute affords. That is the exaction of the argument for the intervenor. The Missouri act, far stronger than our acts, in literal expression, to sustain the interpretation of the factor's power, elicited from the Supreme Court of the United States a dissent from any such construction. Can more be claimed for the Louisiana statutes? In every commercial community there is apt to be a large quantity of property in warehouse awaiting the opportunity for sales. Legislation to facilitate loans on warehouse receipts of such property is of obvious importance. But the natural interpretation of such legislation is, it refers to owners, or those acting for the owner. It would be a strain to infer from such legislation, the legislative authority for the fraud by the factor on his principal, for that character, reason and law attributes to the pledge by the factor for his own uses of the principal's property. We are not called upon, nor do we determine the scope of their acts save in respect to the purpose in hand. We are, however, at liberty to assign, as we have sought to do, the general scope of the acts. The pledge binds the owner who tenders the receipt; it binds the owner who "intrusts" (to borrow the word from the English act) the warehouse receipt or permits it to issue in another name. These instances we give, not as restrictive, but as illustrative. The shipper of rice or cotton to this market is no

Holton & Winn vs. Hubbard & Co. et als.

party to placing the property in the warehouse or causing the receipt to issue. He gives no assent to the pledge. All that, in this case, is the factor's work. All that the principal has done is to ship his property under the mandate to sell it and remit him the proceeds. What we do hold if that, on no fair construction of the statutes is the proposition capable of support that cotton or rice, or other product, not sent here to be sold, can be taken from the owner by the factor's ple 'ge for his own debts, and that the pledgee from the factor, with the notice the law conveys to him, can hold up any statute as a shield against the right of the owner, whose trust has been abused. Our legislation is in aid of all usual legitimate business purposes, but we more than pause on the other and different construction urged on us in this case. If the pledge is to be supported on the theory the pledgee is not to be deemed apprised of the violation of trust by the factor, the answer is in that significance unversally attached to such a pledge. The law presumes that knowledge, and the grounds of the presumption are too obvious to need, and certainly do not require discussion. "The pledgee is bound to know the extent of the factor's power; he may call for the letter of advice, or make inquiry when the factor tenders the pledge, from whence the goods come," is the terse expression of the text-books, repeated in the adjudged cases. 2 Kent, Sec. 9, pp. 62, 67. The burden of inquiry imposed by law is the equivalent of knowledge. In other words, what a man is required to know and can learn, he is presumed to know. Unless, then, we can construe our legislation to sustain pledges of another's property with notice in the pledgee, this pledge can not be maintained. With the most careful consideration, we are utterly unable to interpret legislative acts designed to assist legitimate commercial necessities so as to overthrow long settled principles and sanction what the law deems frauds.

The law is the guide for courts, and fortunately the law is rarely, if ever, repugnant to public interest. We are told, in this case, that public policy requires factors' pledges to be maintained. Under our law the factor can pledge his principal's property to the extent of the factor's advances. Acts 1876, No. 72. The act is to be construed with, and a limitation, if any was needed, on the other acts discussed. If not indebted to the factor and the principal desires his property to be pledged, he can give that direction. What other occasion exists for pledging his property? Is the pledge to be made

in the public interest, or for the factor's benefit, or for the advantage of his creditors? We fail to appreciate the public policy that requires produce sent to this market for sale should be taken for either the public or any private interest, save that of the owner. Any interpretation of this court based on that kind of public policy does not strike us as calculated to promote any public interest.