In ι DREUIL & CO.

Petition of CANAL BANK & TRUST CO.

(District Court, E. D. Louisiana.   May 16, 1913.)

(No. 1,766.)

1. WAREHOUSEMEN (§ 17*)—WAREHOUSE RECEIPTS—PLEDGES—STATUTES.

Louisiana Acts 1908, No. 221, § 40, provides that any negotiable receipt may be negotiated by the owner or by any person to whom the possession or custody of the receipt has been intrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been intrusted, or if at the time of such intrusting the receipt is in such form that it may be negotiated by delivery.  Section 41 declares that one to whom a negotiable receipt has been duly negotiated acquires thereby such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value. Section 47 provides that the validity of a negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty of the person making it, or by the fact that the owner was induced by fraud, mistake, or duress to intrust the possession· or custody of the receipt to such person, if the person to whom the receipt is negotiated, or one to whom the receipt is subsequently negotiated, paid value therefor, without notice of the breach of duty, fraud, mistake, or duress.  *Held*, that where the bankrupts having pledged cotton bills to a bank obtained them by executing trust receipts in order that he might sel· ·the cotton and account to the bank therefor, but instead stored the cotton and pledged warehouse receipts therefor to another bank, he, being a mere bailee. could not convey a better title than he possessed himself, and hence neither under such act nor independent thereof could the bank to which the warehouse receipts were pledged acquire title as· against the original pledgee.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. § 36; Dec. Dig. § 17.*]

2. CARRIERS (§ 58*)—BILLS OF LADING—PLEDGE—RIGHTS AS BAILEES.

Cotton bills having been pledged to a bank, the bankrupts obtained the same by giving therefor trust certificates reciting that it was for convenience only, without novation of the original debt, or giving the bankrupts any title to the cotton except as trustee for the bank, and except to receive the avails thereof or the documents therefor for account of the bank.  *Held*, that by such temporary custody of the bills the bankrupts became bailees only for the bank, and their authority was limited by the trust receipts, and hence they had no authority to pledge the cotton.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 179–190; Dec. Dig. § 58.*]

3. ESTOPPEL (§ 72*)—FRAUD—NEGLIGENCE.

Where a bank to which cotton bills had been pledged in accordance with custom permitted the pledgors to take the documents giving trust receipts therefor, providing that the pledgors acted as trustees for the bank, and were without title except to receive the avails of cotton or the documents for and on account of the bank, there was no negligence in so committing to the pledgors the bank's indicia of title, and hence another bank to which the bankrupts wrongfully pledged the cotton could

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not invoke the doctrine that, where one of two innocent parties must suffer, he who put it in the power must bear the loss.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 188; Dec. Dig. § 72.*]

4. ESTOPPEL (§ 72*)—PERMITTING INJURY BETWEEN PARTIES EQUALLY BLAMELESS—ACTS OF PLEDGEE.

Where pledgees of cotton bills in accordance with a custom delivered the bills to the pledgors against trust receipts and the pledgors wrongfully stored the cotton and pledged warehouse receipts obtained therefor to another bank, the original pledgees were not estopped as against the latter to claim the superior title to the cotton, and the pledgors had no authority to repledge the same.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 188; Dec. Dig. § 72.*]

In bankruptcy. In the matter of bankruptcy proceedings of Dreuil & Co., bankrupts. On petition of the Canal Bank & Trust Company and counterclaim of the Commercial National Bank to recover the proceeds of certain cotton from the trustee. Judgment in favor of the Canal Bank & Trust Company as prayed.

Mooney & Janvier, of New Orleans, La., for Canal Bank & Trust Co.

Merrick, Lewis, Gensler & Schwarz, of New Orleans, La., for Commercial Nat. Bank.

Dufour & Dufour and Hall, Monroe & Lemann, all of New Orleans, for receiver and trustee.

FOSTER, District Judge. In this matter it appears that the bankrupts, Dreuil & Co., pledged to the Canal Bank & Trust Company a bill of lading for 40 bales of cotton, marked "N O Q M," and another for 60 bales of cotton, marked "O I C O." A few days later they obtained the bills of lading from the bank on what are known in banking circles as trust receipts, of which the following, as to their material parts, is a copy:

"Received of Canal Bank & Trust Company the bills of lading or other documents or securities as enumerated below, held by the said bank as collateral pledged to secure advances made to the undersigned, and in consideration thereof, the undersigned hereby agrees to pay over to the said bank or its assignees, and to specifically apply against the very same advances the proceeds of the sale of the property mentioned in the said documents; or to deliver to the said bank or its assignees the shipping documents or warehouse receipts representing the undermentioned goods within one day from the receipt thereof, this delivery being temporarily made the undersigned for convenience only, without novation of the original debt, or giving the undersigned any title thereto, except as trustee for the said bank, and except to receive the avails thereof or the documents therefor for account of the said bank."

Instead of complying with the terms of the trust receipts, they sent the cotton to a pickery, where the 40 bales, marked "N O Q M," were remade into 60 bales, and 60 bales, marked "O I C O," were remade into 90 bales. They next stored the cotton in the Planters' Press, ob-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tained two negotiable warehouse receipts for it, and pledged them to the Commercial National Bank. Thereafter they obtained these two warehouse receipts from the Commercial National Bank on similar trust receipts and, again failing to comply with their agreement, surrendered the warehouse receipts to the press, changed the mark of the bales of the "N O Q M" to "P B I D" and "F A K D," 30 bales each, and changed the mark of the 30 bales of "O I C O" to "B J J D." They then disposed of the 60 remade bales, still marked "O I C O," but the balance of the cotton is still in the warehouse with no negotiable documents out against it. The bankrupts are indebted to each bank in an amount exceeding all the collateral held by it, including the cotton above referred to.

The trustee contends that the cotton on hand is not identified as the cotton originally pledged, and hence forms part of the general estate. This position is not well taken. The proof is ample to identify the cotton, and the contention of the trustee may be dismissed from further consideration.

[1] The Commercial National Bank contends that having received the negotiable warehouse receipts in pledge for value, and without notice, under the uniform warehouse receipts act adopted in Louisiana, Act 221 of 1908, its title is superior to any other. On this question it appears from the report of the commissioners on uniform state laws of January 1, 1910, that the uniform warehouse receipts act was first considered by them in national conference in 1904, and Prof. Samuel Williston and Mr. Barry Mohun were commissioned to draft such an act. The draft was prepared by the gentlemen named, and after due consideration and some changes it was approved by the commissioners in 1906 and recommended to the Legislatures of the several states for passage. The law has been adopted in over 20 states, but apparently no court of last resort has had occasion to construe the sections relied upon by the Commercial National Bank. At least, no cases are cited by counsel, and I have not been able to find any.

It is apparent, however, that the purpose of the law is to facilitate legitimate business, and not to abrogate or change fundamental principles. Both at common law and under the Civil Code of Louisiana, arts. 2452, 3142, a bailee or trespasser could not by selling or pledging the property convey a better title than he possessed himself, even to an innocent third person, and neither the intent nor the letter of the uniform statute will support the proposition that he could do so indirectly by storing the goods and negotiating the receipt. The sections of the law relied upon by the Commercial National Bank material to the issue are as follows:

Section 40:

"A negotiable receipt may be negotiated—(a) By the owner thereof; or (b) By any person to whom the possession or custody of the receipt has been entrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been entrusted, or if at the time of such entrusting the receipt is in such form that it may be negotiated by delivery."

Section 41:

"A person to whom a negotiable receipt has been duly negotiated acquires thereby—(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value."

Section 47:

"The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was induced by fraud, mistake, or duress to entrust the possession or custody of the receipt to such person, if the person to whom the receipt was negotiated, or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, or fraud, mistake, or duress."

From a casual reading of these sections they may seem to support the contention of the Commercial National Bank, as it appears a warehouse receipt may be negotiated by any person to whom it is intrusted by the owner, notwithstanding the negotiation may be a breach of trust. But on analysis it is clear that the provision relied on can have no effect, unless there is in existence a valid warehouse receipt for goods stored by the true owner, or some one having the right and authority to store them, to which they may be applied. Obviously a receipt issued by a warehouse without the authority, knowledge, or consent of the owner of the goods could have no more effect than a forged bill or note.

The commissioners on uniform state laws, in their report of January 1, 1910, referring to sections 40 and 41, had this to say:

"This section and the next are of fundamental importance to the mercantile community. They state familiar law in regard to bills and notes and there is authority for them in the statutes making warehouse receipts and bills of lading negotiable and in well recognized mercantile custom. It will be noticed that one who takes by trespass or a finder is not included within the description of those who may negotiate."

Prof. Williston, with reference to the uniform act, states the rule as follows:

"As a general proposition it needs no argument to show that a bailor having no title to goods cannot, by depositing them with the warehouseman, or carrier, and receiving a document of title in return, whatever its form, give a good title to a purchaser of the document, however innocent the purchaser may be." Williston on Sales, par. 421.

Moreover, the uniform act is but a step in the development of the law, and decisions relating to prior and similar acts are safe guides to its construction. In Commercial Bank of Selma v. Hurt, 99 Ala. 130, 12 South. 568, 19 L. R. A. 701, 42 Am. St. Rep. 38, a case almost identical with the one at bar, the court, in upholding the title of the owner of the goods, in the course of its opinion, took occasion to say:

"We cannot conceive that it could have been within the contemplation of the Legislature that the provisions of the statute would enable a thief, by depositing the stolen property with a warehouseman and obtaining a receipt for it in due form, to confer upon an innocent purchaser for value and in

good faith a claim to the property, which would prevail against that of the true owner."

And it is doubtful that Act No. 221 of 1908 changed the law of Louisiana materially. Section 7 of Act No. 156 of 1888, in force up to that time, provided as follows:

"That the receipts issued against property stored in public warehouses, as herein provided for, shall be negotiable and transferable by endorsement * * * and delivery in the same manner and to the same extent as bills of exchange and promissory notes now are, without other formality, and the transferree or holder of such public warehouse receipt shall be considered and held as the actual and exclusive owner, to all intents and purposes, of the property therein described, subject only to the lien and privileges of the public warehouseman for storage or other warehouse charges."

In Holton v. Hubbard, 49 La. Ann. 715, 22 South. 338, a case arising under this act, the Supreme Court of Louisiana reviewed the statutes and the jurisprudence, and held that, when property was shipped to a factor for the purpose of sale only and was stored by him and the receipt pledged to secure the factor's debt, the owner was not precluded to claim the property; that articles 2452 and 3142 of the Civil Code which strike with nullity the sale or pledge of the property of another were not repealed by the act; that, if it could be held that the act intended to repeal these articles of the Code, it would be open to the objection of unconstitutionality because no such purpose was stated in its title. Mr. Justice Miller, in denying a rehearing, summed up the court's conclusions as follows:

"With the most careful consideration, we are utterly unable to interpret legislative acts designed to assist legitimate commercial necessities so as to overthrow long-settled principles and sanction what the law deems frauds."

See, also, Frantz v. Winehill, 124 La. 680, 50 South. 650.

[2] The Canal Bank & Trust Company was constructively the owner of the cotton by virtue of its pledge, and as holder of the bills, of lading. When it surrendered the temporary custody of the bills of lading to the bankrupts, they became its bailees, and their authority was restricted and governed by the trust receipts and did not include the right to pledge the cotton. R. S. of Louisiana, § 2482; Lallande v. His Creditors, 42 La. Ann. 705, 7 South. 895; Bank v. Meyer, 43 La. Ann. 1, 8 South. 433; Insurance Company v. Kiger, 103 U. S. 352, 26 L. Ed. 433; Shaw v. Railroad Company, 101 U. S. 562, 25 L. Ed. 892.

[3] The Commercial National Bank also invokes the doctrine that, where one of two innocent parties must suffer, he who put it in the power of the wrongdoer to commit the wrong must bear the burden. This doctrine, of course, could have no application unless the Canal Bank & Trust Company was guilty of negligence.

[4] It would be greatly inconvenient, if not impracticable, to conduct the cotton business unless cotton merchants were intrusted with the temporary possession of negotiable bills of lading and warehouse receipts for the purpose of having the cotton sampled and classed and marked, weighed, and shipped when sold. It is the well-recognized custom in New Orleans to do so. Therefore the Canal Bank & Trust

Company was guilty of no negligence in surrendering the bills of lading on trust receipts, and the record does not disclose that they did or said anything else that could estop them. Civil Code, arts. 3142, 3145, 3146; Clark v. Iselen, 21 Wall. 360, 22 L. Ed. 568. If the cotton had been stored by the bankrupts, at a time the unincumbered ownership was in them and the receipts had been pledged to the Canal Bank & Trust Company and subsequently withdrawn on trust receipts and then fraudulently pledged to the Commercial National Bank, the situation would be different, and no doubt the provisions of the act would apply, and decisions dealing with negotiable securities and bills and notes would have bearing. As it is, in the light of the above quoted authorities, the conclusion is irresistible that the Commercial National Bank takes nothing by the act, and the title of the Canal Bank & Trust Company is superior. The Canal Bank & Trust Company invokes the doctrine that, where equities are equal, the first in order of time must prevail. It may be that their contention is well founded, in view of the fact that their pledge was prior to that of the other bank, and neither has in its possession the documents pledged to it and that same have been executed and canceled. But entertaining the above views, it is unnecessary to consider this question, and with regard to it I express no opinion.

There will be judgment in favor of the Canal Bank & Trust Company as prayed for.